## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HEARTLAND PAYMENT SYSTEMS, LLC, | § | No. 582, 2016 |
| | § | |
| Defendant/Counterclaim Plaintiff Below-Appellant, | § | Court Below – Court of Chancery of the State of Delaware |
| | § | |
| v. | § | |
| | § | C.A. No. 11523 |
| INTEAM ASSOCIATES, LLC and LAWRENCE GOODMAN, III, | § | |
| | § | |
| Plaintiff/Counterclaim Defendants Below-Appellees. | § | |
| _____ | § | |
| INTEAM ASSOCIATES, LLC, | § | |
| | § | |
| Plaintiff/Counterclaim Defendant Below-Appellee/ Cross-Appellant, | § | |
| | § | |
| v. | § | |
| | § | |
| HEARTLAND PAYMENT SYSTEMS, LLC, | § | |
| | § | |
| Defendant/Counterclaim Plaintiff Below-Appellant/ Cross-Appellee. | § | |

Submitted: June 14, 2017
Decided: August 17, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, and **SEITZ**, Justices.

Upon appeal from the Court of Chancery: **AFFIRMED** in part and **REVERSED** in part and **REMANDED**.

Jeffrey L. Moyer, Esquire (*argued*), Travis S. Hunter, Esquire, and Nicole K. Pedi, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware for Appellant/Cross-Appellee Heartland Payments Systems, LLC.

Thad J. Bracegirdle, Esquire (*argued*), and Andrea S. Brooks, Esquire, Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware for Appellees/Cross-Appellant inTEAM Associates, LLC and Lawrence Goodman, III.

**SEITZ**, Justice:

In 2010, Congress enacted the Healthy, Hunger-Free Kids Act which made major changes to the national school lunch program. The Act required the United States Department of Agriculture (the "USDA") to develop new regulations to take effect in 2012 to address new nutritional guidelines. In 2011, Heartland Payment Systems, Inc. ("Heartland"), a credit card processing company, wanted to expand its school operations. To pursue this strategy, Heartland purchased some of the assets of School Link Technologies, Inc. ("SL-Tech"). SL-Tech marketed software products to schools to manage their foodservice operations.

Through the purchase of SL-Tech, Heartland acquired WebSMARTT, a software program that allowed schools to monitor school meal nutrition through point of sale, free and reduced meal eligibility tracking, menu planning, nutrient analysis, and recordkeeping. Carved out of the transaction, however, was a consulting division of SL-Tech called inTEAM and its software, Decision Support Toolkit ("DST"), which was still in development at the time of the transaction. inTEAM was designing DST for school districts as a complementary product to WebSMARTT. It was intended to collect menu plan data from WebSMARTT and similar applications and then use the data to model the effect of menu plans on staffing, equipment, and other costs.

The parties executed three contracts involving Heartland, SL-Tech, and SL-Tech's CEO, Lawrence Goodman. The contracts contained non-compete, non-

solicitation, exclusivity, cross-marketing, and support obligations. Through the carve-out of SL-Tech's inTEAM business, the parties agreed that inTEAM could continue with the "inTEAM Business as currently conducted" after closing.

With the transaction in the rear-view mirror, the parties quickly lost sight of their post-closing contractual obligations. inTEAM developed a new software program module, Menu Compliance Tool+, with overlapping capabilities with WebSMARTT—specifically, nutrient analysis and menu planning. Goodman tried to solicit one of Heartland's customers. Heartland paired with one of inTEAM's biggest competitors to submit a bid to provide software to the Texas Department of Agriculture.

The disputes eventually found their way to the Court of Chancery through breach of contract claims and counterclaims. After a four-day trial, the Court of Chancery found inTEAM did not breach any of its contractual obligations, but Goodman and Heartland had breached certain of theirs. According to the court, although WebSMARTT and the Menu Compliance Tool+ module both analyzed nutrients, the USDA approved each of the software programs for nutrient analysis under different standards. Thus, they did not compete with each other. The Court of Chancery also found that the carve-out for the "inTEAM Business as currently conducted" allowed inTEAM to develop software with menu planning

2

functionality—the same functionality also present in the WebSMARTT software program.

Turning to Heartland, the Court of Chancery found Heartland breached the non-compete and exclusivity provisions of the co-marketing agreement by working with a known inTEAM competitor. The court decided that Heartland's breach began on March 17, 2014 and ran until September 8, 2015, and thus extended Heartland's non-compete restrictions for an additional eighteen months. For Goodman, the court determined that Goodman breached a non-solicitation provision in the consulting agreement by soliciting one of Heartland's customers. As the court held, Goodman's breach ran from July 24, 2014 to December 15, 2014, and thus the court extended Goodman's non-solicitation period by an additional six months. The Court of Chancery also ordered Goodman to pay Heartland damages equal to the salary he was paid while he was in breach, totaling $50,003.01. The Court of Chancery did not award inTEAM attorneys' fees, finding that a cap on liability in the co-marketing agreement precluded the fee award. Both parties appealed.

We reverse the Court of Chancery's finding that Goodman and inTEAM did not breach their non-compete obligations under the various agreements, but otherwise affirm the court's decision. Goodman was prohibited from providing any competitive services or products or engaging in any business that SL-Tech conducted as of the closing date. inTEAM had similar restrictions. At the time of

3

the transaction SL-Tech had a software product, WebSMARTT, that was part of SL-Tech's business as of the closing date that performed nutrient analysis and menu planning. inTEAM did not. At closing, inTEAM's business was data analytics and modeling, not school lunch program data generation and menu planning for USDA compliance purposes. The transaction agreements prohibited inTEAM from developing a software product that competed head to head with WebSMARTT, a product Heartland paid SL-Tech $17 million to acquire. By changing direction and developing Menu Compliance Tool+ to perform nutrient analysis and menu planning, Goodman and inTEAM competed directly with WebSMARTT and breached the transaction agreements.

As for the remaining issues, the Court of Chancery properly found that Heartland breached its contractual obligations by collaborating with an inTEAM competitor, and Goodman breached by soliciting a customer of Heartland. The court also did not abuse its discretion when it required an extension of the non-competes and assessed damages against Goodman.

We therefore affirm in part and reverse in part the decision of the Court of Chancery. We remand the case to the Court of Chancery to exercise its broad discretion to craft a remedy sufficient to compensate Heartland for Goodman's and inTEAM's breaches of the transaction agreements.

4

**I.**

*A.*

Since Congress passed the National School Lunch Act in 1946, the USDA has regulated and provided federal subsidies to state school lunch programs. From the mid-1940s into the 1990s, regulations focused on four meal components: meat, vegetables/fruit, grains, and milk. In the mid-1990s, regulations shifted to aged-based nutrient targets, which required schools to track extensive amounts of data to obtain their subsidies. Software developers designed programs to assist school districts in managing the data and submitting reimbursement claims to state agencies, which are charged with distributing federal funds made available by the USDA.

In 2010, Congress passed the Healthy, Hunger-Free Kids Act ("HHFKA" or the "Act"), the first major change to the school lunch program in fifteen years. The Act set minimum standards for school wellness policies, mandated minimum fruit, vegetable, and whole grain servings, and set maximum sodium, sugar, and fat content of meals. It also authorized the USDA to set new standards for the school lunch program, and required the USDA to publish proposed meal pattern regulations within eighteen months of its enactment.[1]

---

[1] 42 U.S.C. § 1753(b)(3)(A)(ii)(I).

The newly issued USDA regulations went back to food group-based menu planning to replace nutrient-based menu planning. The new meal pattern requirements were centered around five main food groups: meat/high protein foods; whole grains; vegetables; fruit; and fat free/low-fat milk. Each food group has specified subcategories and nutrient targets for calories, saturated fat, trans fat, and sodium. The USDA first proposed the change on January 13, 2011. It became effective July 1, 2012.

Although the new meal pattern requirements were mandatory, the USDA offered schools certified to be in compliance with the new regulations an additional six cents per meal to incentivize schools to implement the changes quickly.[2] To become certified, the school had to submit documentation to the governing state authority demonstrating its compliance with the meal pattern requirements. The state agency makes an initial certification determination, and then monitors each school district's ongoing compliance with the requirements through an administrative review process that occurs every three years. This process is known as "Six Cent Certification."

---

[2] 42 U.S.C. §1753(b)(3)(C)(i); *see also* Cynthia Long, *Child Nutrition Reauthorization 2010: Questions and Answers Related to the Certification of Compliance with Meal Requirements for the National School Lunch Program*, U.S. DEP'T OF AGRIC., at 2-3 (Jan. 22, 2013) [hereinafter USDA Memo], *available at* https://www.fns.usda.gov/sites/default/files/SP31-2012osr3.pdf.

Schools have three options to obtain Six Cent Certification. Under the first option, schools submit one week of menus, a USDA menu worksheet, and a nutrient analysis with calories and saturated fat for each menu type. Schools that choose this option must use USDA-approved nutrient analysis software to compile the information.[3] According to the USDA, "[t]his option acknowledges that a large number of [schools] already use nutrient analysis software to monitor the nutrient levels in their meals."[4] Under the second option, schools submit one week of menus and a USDA menu worksheet, but submit a simplified nutrient assessment instead of the in-depth nutrient analysis.[5] As the USDA has stated, "[t]his option recognizes that not all [schools] use nutrient analysis software. A simplified nutrient assessment is intended to be a proxy for the nutrient analysis."[6] Under the third option, a state agency performs an on-site review to certify school compliance with the regulations.

*B.*

Goodman founded SL-Tech in 1985. SL-Tech provided software products to assist schools in tracking their child nutrition programs to obtain federal subsidies.

---

[3] 7 C.F.R. § 210.10(i).

[4] USDA Memo at 7.

[5] A simplified nutrient assessment requires schools to track only calories, percent of calories from saturated fat, and sodium. Estimates for calories and saturated fat of milk, fruits, and vegetables are pre-programmed in the simplified nutrient assessment software. Schools must provide calories and saturated fat information for all main dish items, side items with grains, meat, desserts, and condiments. *Directions for Simplified Nutrient Assessment for Lunch*, U.S. DEP'T OF AGRIC., at 1-2 (Sept. 2, 2014), *available at* https://www.fns.usda.gov/sites/default/files/cn/SP34-2012assessment_directions.pdf.

[6] *Id.*; *see also* App. to Opening Br. at 2426-27 (Griffin Trial Test.).

The software included both front-of-house and back-of-house operations. Front-of-house operations means point of sale systems and application processing for free and reduced price meals. Back-of-house operations means purchasing, inventory, and menu planning.

Before the transaction, a division of SL-Tech, inTEAM, was a "15 year-old management consulting company known historically for its hands-on workshops in financial management for school nutrition programs."[7] SL-Tech purchased inTEAM in 2004 to complement SL-Tech's existing software products. Its consulting services helped customers standardize their processes to collect and use the data generated from school nutrition programs to improve their operations.[8]

SL-Tech had three software products relevant to this appeal: WebSMARTT, mylunchmoney.com, and DST. WebSMARTT was SL-Tech's "core product."[9] WebSMARTT was a fully integrated end-to-end foodservice management program that provided point of sale, free and reduced meal application processing, ordering and inventory, and menu planning and production.[10] Menu planning is "the heart" of WebSMARTT.[11]

---

[7] App. to Opening Br. at 884 (inTEAM Associates, Inc. 2011 Business Plan).
[8] *Id.*
[9] *Id.* at 38 (SL-Tech's Business and Investment Plans Summary).
[10] *Id.* at 51 (SL-Tech Feb. 18, 2009 Presentation to New York City Dep't of Educ.).
[11] *Id.* at 56.

mylunchmoney.com was an online service that allowed parents to provide money for their children for cafeteria use, check their account balances, and to see what they were purchasing. It was used by over 900 school districts in forty-two states at the time of the transaction in 2011.

DST was cloud-based software first developed as a prototype in 2007 for use as a modeling tool to collect and analyze the data from point of sale, back-of-house, financial management, and payroll systems. DST software allowed schools to make informed decisions about the operation of their school lunch programs.[12] As described in an internal document sent to Goodman in 2009:

> The DST modeling component utilizes basic foodservice operating principles, recognized by inTEAM consultants as fundamental to achieving high performing school nutrition programs. DST uses a "systems approach" to assess, develop and refine key foodservice operating processes such as menu planning, work methods, equipment selection, employee scheduling and staff training.
>
> DST is not intended to replace the current [point of sale] or back of the house transactional software. It simply uses data from the current transactional systems to identify limitations in [the] current operating process and allows the User to test the effect of making incremental changes in one or more of these processes. The transactional data sets used to drive the DST models and inTEAM consulting services will vary depending on District characteristics, however the process will remain consistent.
> …
> It is widely accepted in the industry that the menu is the driving force affecting all other aspects of a quantity foodservice operation. Thus,

---

[12] *Id*. at 884 (inTEAM 2011 Business Plan).

9

capturing the current school based menu plans is the first step in initiating the "what if" modeling capabilities of DST.[13]

DST relied on sources like WebSMARTT to provide the menu plan data.[14]

SL-Tech planned to roll out DST in two phases. In Phase, 1 SL-Tech would develop a program to analyze sales and meal count data. In Phase 2, DST would use menu planning data to allow users to create operational models such as work methods, equipment availability, and procurement.[15]

In 2009, SL-Tech engaged High5LA, LLC[16] to develop and write the functional specifications for DST Phase 2 (the "Functional Design Documents").

---

[13] *Id*. at 942.

[14] Oral Arg. at 33:22-33:26; App to Opening Br. at 2844-45 (Prescott Trial Test.):

Q:    How would customers use the DST products?
A:    So they would take data from their source systems, like WebSMARTT, upload that data into DST, and then we would create different analytics and reporting on top of that data that the user could then use to make decisions on their business.
Q:    Okay. And how was the DST product supposed to function with the WebSMARTT product that we talked about?
A:    They are meant to work together by exporting the data from WebSMARTT and then importing into DST.
Q:    Okay. And at your time at SL-Tech, what ability, if any, did DST have to generate transactional data that we discussed a few minutes ago?
A:    It did not. You would use a source system, a tool like WebSMARTT, to create that transactional data.
Q:    Just to make sure I understand, when you say a "source system," what do you mean by that?
A:    So in a data warehouse analytical-type tool, you wouldn't be expected to produce the data you are going to analyze. That would come from another piece of software. For example, WebSMARTT.

[15] App. to Opening Br. at 2057 (Goodman Trial Test.).

[16] At the time of the transaction, High5LA was named Startech Global Corporation, but changed its name after continually being confused with the science fiction media franchise "Star Trek." *Id*. at 2509 (Ditch Trial Test.).

According to the "overview" section of the Functional Design Documents, in DST Phase 2, school systems that had installed DST Phase 1 would

> [B]e able to leverage menu planning as a tool to project the impact on staffing, equipment, and food/labor costs. They [would] also be able to model in advance menu plans, work schedules and financials to accurately predict the outcome under a variable set of assumptions. inTEAM philosophy and best practices drive the design of Phase 2, resulting in a product that allows school administrators to accurately model future scenarios and compare/evaluate it against reality.[17]

*C.*

Heartland provided payment processing services to merchants throughout the United States. In 2010, it entered the school services market through its School Solutions division to provide nutrition and payment solutions to K-12 schools. At the end of 2010, Heartland began considering opportunities to add to its School Solutions division. Heartland wanted to become the leading K-12 point of sale provider, and ultimately to offer online payments to all schools. To achieve its goal, Heartland believed it "needed to provide the full [point of sale] solution to schools" because schools "were not interested in buying . . . just the front-of-the-house solution that provided the checkout at the end of the ordering line. [Schools] also wanted to be able to have all of the back-of-the-house solutions integrated with the front-of-the-house solution. And so in order for [Heartland] to be successful in this

---

[17] *Id*. at 97 (Functional Design Documents).

market and selling credit card processing, it also required [Heartland] to enter the food service market with a full solution."[18]

Heartland approached SL-Tech about a potential acquisition. It did not want to purchase SL-Tech's subsidiary inTEAM because inTEAM was primarily a consulting business, which Heartland did not view as key to its strategy of "acquiring companies that provided the point-of-sale solutions to K through 12 schools."[19] As a result, the parties separated SL-Tech's inTEAM division—with its DST software product in development—from the transaction. The parties eventually reached agreement and documented the transaction through three agreements: (1) the Asset Purchase Agreement; (2) the Co-Marketing Agreement; and (3) the Consulting Agreement.

### i. The Asset Purchase Agreement

Under the Asset Purchase Agreement ("APA"), Heartland acquired substantially all of SL-Tech's assets for $17 million plus earn-out payments on each of the first three anniversaries of closing. Section 5(n) of the APA also included the following non-compete:

> *Covenant Not to Compete.* For a period of five (5) years from and after the Closing Date, neither Seller nor the Major Shareholder will engage directly or indirectly, on Seller's or the Major Shareholder's own behalf or as a Principal or Representative of any Person, in providing any

---

[18] *Id.* at 2653-54 (Lawler Trial Test.).
[19] *Id.* at 2641.

Competitive Services or Products or any business that School-Link conducts as of the Closing Date in any of the Restricted Territory . . . .[20]

Under the APA, the "Seller" is SL-Tech, Goodman is the "Major Shareholder," the "Closing Date" is September 30, 2011, and the "Restricted Territory" is the United States.[21] "Competitive Services or Products," "School-Link," and "inTEAM Business" are defined under the APA as follows:

"*Competitive Services or Products*" means a business that develops, manufactures, sells and services and maintains computer software and/or [point of sale] terminal hardware designed to facilitate (i) accounting and (ii) management and reporting of transactional data functions, of food services operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, and entry of meal and other payments by parents via the Internet or kiosk); *provided, however*, that for purposes of clarity, Competitive Services or Products shall not include the inTEAM Business as currently conducted.[22]

"*School-Link*" means the entirety of Seller's business, including the business of Seller known as "School-Link," but excluding the inTEAM Business."[23]

"*inTEAM Business*" means certain Excluded Assets consisting of Seller's consulting, elearning and DST segments of the business known as "inTEAM" and including those products and services described in Exhibit C to the Co-Marketing Agreement.[24]

---

[20] *Id.* at 380.
[21] *Id.* at 420.
[22] *Id*. at 413 (italics in original).
[23] *Id*. at 420.
[24] *Id*. at 416.

13

## ii. The Co-Marketing Agreement

The Co-Marketing Agreement ("CMA") was a commission-based contract that gave both Heartland and inTEAM the right to market, advertise, and promote each other's products.[25] The CMA contained a five-year bilateral non-compete:

> Except as otherwise provided herein, . . . (A) HPS shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the inTEAM Business, and HPS hereby grants to inTEAM the exclusive right and license under any intellectual property of HPS (other than trademarks) to conduct the inTEAM Business and (B) inTEAM shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the HPS Business, and inTEAM hereby grants to HPS the exclusive right and license under any intellectual property of inTEAM (other than trademarks) to conduct the HPS Business.[26]

"HPS Business" is defined under the CMA as:

> [T]he development, manufacture, or sale of computer software and/or [point of sale] terminal hardware designed to facilitate (A) accounting and (B) reporting of transactional data functions and management of [] food service operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, and entry of meal and other payments by parents via the Internet or kiosk).[27]

"inTEAM Business" is defined as:

> [C]ertain Excluded Assets consisting of inTEAM's consulting, eLearning and DST segments of the business known as "inTEAM" and

---

[25] inTEAM assumed and was assigned all of SL-Tech's rights under the CMA through an Assignment and Assumption Agreement, dated October 31, 2011.

[26] App. to Opening Br. at 317.

[27] *Id*. at 303.

including those products and services described in <u>Exhibit A</u>[28] and those inTEAM products and services described in <u>Exhibit C</u> and <u>Exhibit D</u>.[29]

Exhibit C states:

### Functional Specifications

Functional specifications for DST Phase 1 and add-ons and DST
Phase 2 (future release); including unique state value added
functionality (attached)
Student Rewards functional specifications (attached)
Off Campus Merchants Functional specifications (attached)[30]

Attached to the CMA and incorporated by reference are the Functional Design Documents for DST Phase 2. Two Functional Design Documents were introduced and discussed at trial: "Milestone A – Menu Item" and "Milestone B – Menu Planning."[31] The Milestone A Functional Design Document describes its purpose as the following:

In order to support Operational and Financial Modeling, Milestone A introduces four new information categories to DST – Staff, Equipment, Work Method and Menu Item. This design specification is an anchor document that catalogs the functional requirements for DST Phase 2 – Milestone A – Menu Item.

---

[28] Exhibit A references the following products and services: inTEAM Consulting Services, inTEAM eLearning, DST Phase 1, and DST Phase 2. *Id*. at 328.

[29] *Id*. at 303.

[30] *Id*. at 330. Exhibit D states:
**Interface and Mechanical Specifications**
DST data interface and content mechanical specifications (attached)
Student Rewards data interface and content mechanical specifications (attached)
Off-Campus Merchants data interface and content mechanical specifications (attached).

[31] *Id*. at 93, 144.

It further states:

> A Menu Item is a food item that is ultimately served to the student. Milestone A defines the setup of these items, while Milestone B will put collections of items onto menu plans for servicing building programs and generate work schedules that will model how build staffs and equipment will work to produce the items needed.[32]

The Functional Design Document for Milestone B describes its purpose as:

> A central component to creating an Operational Model is the modeling of menus. This design specification is an anchor document that catalogs the functional requirements needed to create a subset of the WebSMARTT Menu Planning hierarchy as part of DST Phase 2 Milestone B. This specification contains high level workflows, page level design specifications, and page level interactions. This chapter provides a brief overview of each, with rest of the document providing a page level design specifications.[33]

### iii. The Consulting Agreement

Goodman also executed a Consulting Agreement with Heartland under which Goodman agreed to act as "a strategic advisor and liaison with key industry stakeholders advancing Heartland's objectives at meetings and conferences," among other duties.[34] Goodman was to be paid $16,666.67 per month over the course of three years, totaling $600,000. Under § 3 of the Consulting Agreement, "[i]n the event the Consultant breaches Sections 7, 8, 9, 10 or 11 of this Agreement, Heartland shall have no obligation to pay the Consultant any compensation set forth herein."[35]

---

[32] *Id.* at 99.
[33] *Id.* at 149.
[34] *Id.* at 290.
[35] *Id.* at 291.

Section 11(a) of the Consulting Agreement includes another five year non-compete, and § 11(b) includes a non-solicitation provision.

*D.*

*i.      inTEAM Expands the Functionality of Its Software Products After Closing*

At the time of the transaction, inTEAM had finished developing and was marketing DST Phase 1. After the transaction closed, inTEAM continued to develop DST Phase 2. inTEAM decided to incorporate the USDA's simplified nutrient assessment components into the existing DST functions to create the "Menu Compliance Tool+" module.[36] Unlike the modeling and forecasting functions contemplated by the Functional Design Documents, the module assisted customers with ensuring compliance with the USDA's meal-planning regulations that had been finalized in 2012.[37] The module can analyze nutrients such as calories, saturated fat, sodium, and carbohydrates—the same analysis done by WebSMARTT, but on a more limited basis.[38] It was the first USDA-approved menu planning tool for Six Cent Certification. It is not currently certified by the USDA as "nutrient analysis

---

[36] *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *11 (Del. Ch. Sept. 30, 2016).

[37] App. to Opening Br. at 2414 (Griffin Trial Test.).

[38] *Id.* at 2460-61; *id.* at 1474 (inTEAM Website Products and Services Page).

17

software."  In 2014, inTEAM also added administrative review software to its product line.[39]

inTEAM's employees questioned inTEAM's decision to create the new module.  inTEAM's former Chief Operation Officer, Erik Ramp, wrote to inTEAM's Vice President of Operations, Geri Hughes, "you know [we're] basically developing a competing product with [Heartland] now.  Chip doesn't think so . . . but I don't think an outsider will see it that way."[40]

### ii.  inTEAM Employees E-mail Potential Customers

On July 24, 2014, Goodman sent an e-mail to Hughes with the subject line "St. Paul Window of Opportunity."  Goodman wrote in the e-mail "Did Mary Jo recap the opportunity to you?" to which Hughes replied, "Yes. I will discuss with you when we meet this afternoon.  As you know, Jean's replacement (Jim) [has] not been as interested in help and this is her new approach."[41]  Below Hughes' reply is

---

[39] inTEAM's Administrative Review Module is designed to help schools prepare for formal state agency administrative reviews.  The software helps compile and analyze data, and present the data in an appropriate format to comply with regulations.  It also includes "mock reviews" to help districts assess their readiness for the formal administrative review.  *See Dramatically Improve Your Administrative Review Results with a Mock Review from inTEAM*, INTEAM ASSOCS., at 1 (2014), *available at* http://inteam.digitaldogs.com/BI/wp-content/uploads/2014/03/inTEAM-Admin-Reviews.pdf.

[40] App. to Opening Br. at 915.  Goodman's nickname is Chip.

[41] *inTEAM Assocs.*, 2016 WL 5660282, at *11 (Del. Ch. Sept. 30, 2016).

the tagline: "Note to Jim Hemmen regarding our menu planning tool/production record alternative to WebSMARTT."[42]

On December 15, 2014, Mary Jo Tuckwell[43] sent an e-mail to an administrator at St. Paul Public Schools which said, in pertinent part:

> Based on the interactions I had with Jim at ANC in July I believe the department was still struggling with automating production records. In August there was discussion of me providing a demo to key central office staff of the inTEAM menu planning and production record modules as an alternative to the WebSMARTT BOH system. That offer remains open if your team is interested. I know the challenges of bringing establishing and maintaining a traditional BOH system. Yet, I can tell you that the quality of operational communication is enhanced tremendously by automated production records to accurately forecast and provide feedback to the menu planner on usage combinations. So whether you stay with WebSMARTT or are interested in an alternative, I would urge the team to prioritize this activity to achieve financial success.[44]

Tuckwell forwarded the e-mail to Hughes. Hughes forwarded the e-mail to Goodman and Michael Sawicky[45] and wrote "FYI-- we have confirmed that Jim is leaving St Paul and he has been stopping our efforts so that is good. However, Jean is going to bring in a former St Paul director at the moment. I give MJ full credit for continuing to nurture this key relationship with Jean and for continuing to push for them to use our tools."[46]

---

[42] *Id.*

[43] Tuckwell is inTEAM's Technical Director for Consulting Services.

[44] App. to Opening Br. at 970.

[45] Sawicky is the Chief Technologist and Business Intelligence Architect at inTEAM.

[46] App. to Opening Br. at 970.

### iii.    *Heartland Collaborates with Colyar*

On May 12, 2015, the Texas Department of Agriculture ("TDA") issued a request for proposals titled, "REQUEST FOR OFFERS TO PROVIDE Menu Analysis & Planning System (MAPS) Software Solutions," asking vendors to solicit offers to provide web-based software to support the USDA's new meal pattern requirements.[47]   On May 27, 2015, inTEAM contacted Heartland regarding a possible joint proposal, which Heartland declined.  On June 19, 2015, Heartland submitted a joint bid with Colyar Technology Solutions, Inc.—an inTEAM competitor since 2014.  inTEAM submitted a bid on the same day.  In its proposal, inTEAM stated that its new software would be able to meet all of the TDA's requirements, including point of sale, nutrient analysis, and menu planning.  Neither the inTEAM nor the Heartland/Colyar bids were selected by the TDA.

### iv.    *inTEAM Launches CN Central*

In July 2015, Goodman presented inTEAM's "Big Reveal" of its new software, CN Central.  CN Central combined all of inTEAM's modules under one system, including Menu Compliance Tool+, to create "a single destination that includes all of inTEAM's technology tools including: Menu Compliance, Menu Costing, Production Records, Administrative Reviews . . .  Data Analytics,

---

[47] *Available at*, http://www.bidnet.com/closed-government-contracts/menu-analysis---planning-system--maps--software-solutions?itemId=353530787.

20

eLearning and Menu Sharing."[48]  This brought together the ability to analyze nutrients, menu plan, menu search, menu share, and generate production records.[49]

*E.*

On July 20, 2015, after learning of Heartland's collaboration with Colyar, inTEAM notified Heartland in writing that it believed Heartland was in breach of the CMA.  On September 21, 2015, inTEAM sued Heartland in the Court of Chancery alleging breach of contract claims.  Heartland responded by asserting breach of contract counterclaims against inTEAM and Goodman.

After a four-day trial, on September 30, 2016, the Court of Chancery issued its decision finding that inTEAM did not breach any of its contractual obligations, but Goodman and Heartland breached some of their post-closing obligations.  The Court of Chancery found that because inTEAM's Menu Compliance Tool+ could only conduct a simplified nutrient assessment, and WebSMARTT could run a full nutrient analysis as defined by USDA guidelines, inTEAM did not violate the non-compete provisions.  The Court of Chancery also found inTEAM's business activities did not breach the non-compete obligations under the APA or the CMA. As the court held, even though the products were directly competitive, the Functional Design Documents—which defined the carve-out of inTEAM's business from the

---

[48] App. to Opening Br. at 1473 (inTEAM Website Products and Services Page).
[49] *Id*. at 1473-75.

21

transaction—described a product with menu planning functionality that would allow users to create, edit, copy, and save menu items, menu categories, and menus to be placed in menu cycles. Thus, the Court of Chancery determined that the CMA unambiguously included menu planning in the definition of the inTEAM business carved out of the transaction.

Next, the Court of Chancery found that Heartland breached its non-compete and exclusivity obligations under the CMA when it collaborated with Colyar, a direct inTEAM competitor, to submit a bid to the TDA. The Court of Chancery found that Heartland did not breach any obligations under the other agreements. Finally, the Court of Chancery found that Goodman breached his non-solicitation obligations under the Consulting Agreement by encouraging St. Paul Public Schools to terminate its relationship with Heartland.

According to the Court of Chancery, Heartland's breach began on March 17, 2014, when its relationship with Colyar first began, and ran until September 8, 2015, when Heartland announced that the TDA had not selected its proposal. The court thus extended the non-compete for eighteen months, beginning September 30, 2016, and ending March 21, 2018. The Court of Chancery did not award inTEAM attorneys' fees, finding that there was a cap on liability in the CMA. As the court held, because inTEAM had not paid Heartland any fees under the CMA and did not argue that an exception applied, inTEAM was not entitled to any costs or fees.

22

For Goodman, the court determined that his breach began on July 24, 2014, when Goodman asked Hughes to work on making St. Paul School District a customer, and ran to December 15, 2014 when Tuckwell's e-mail chain with a St. Paul Public School official was forwarded to Goodman, among other inTEAM employees. The court ordered a six-month extension of the non-solicitation period to begin on September 30, 2016 and end March 22, 2017. The Court of Chancery also ordered Goodman to pay Heartland damages equal to the salary he was paid during the three months he was in breach of the Consulting Agreement, totaling $50,003.01.[50]

This appeal and cross-appeal followed. Heartland claims the Court of Chancery erred by: (1) finding that inTEAM and Goodman did not breach their respective non-compete provisions; (2) holding that Heartland breached the non-compete provision under the CMA and ordering an eighteen-month injunction; and (3) requiring Goodman to return only $50,003.01 of his $600,000 salary. inTEAM argues the Court of Chancery erred by not awarding it attorneys' fees. We defer to the Court of Chancery's factual findings supported by the record, but review the Court of Chancery's contract interpretation *de novo*.[51]

---

[50] Under the Consulting Agreement, Goodman was to be paid a salary for three years (through September 2014), however, his non-solicitation obligations were extended for an extra two years (five in total). Thus, he was only paid a salary for three months of the six he was in breach.

[51] *Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 950 (Del. 2005).

**II.**

Before stepping through the specific contractual provisions it is helpful to look at the transaction from a distance, because "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[52] Heartland paid SL-Tech and Goodman $17 million for a substantial part of the SL-Tech business so Heartland could expand its presence in the school market. By acquiring SL-Tech, Heartland could offer schools not just a financial product, but, through WebSMARTT, a front to back foodservice solution, which included nutrient analysis and menu planning. WebSMARTT's nutrient analysis and menu planning features were at the heart of SL-Tech's business because they allowed schools to demonstrate compliance with USDA guidelines. To protect Heartland from post-closing competition by Goodman and inTEAM in the same business space, the parties agreed to non-compete and non-solicitation provisions.

Heartland was not interested in inTEAM, SL-Tech's consulting business, or its DST software. SL-Tech marketed DST software as complementary to WebSMARTT. DST Phase 2, which was still in development, would use the menu planning and nutrient analysis data from WebSMARTT and similar programs to

---

[52] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, __ A.3d __, 2017 WL 2774563, at *1 (Del. June 27, 2017).

24

perform data analytics and forecasting. The parties carved out the inTEAM business "as currently conducted," which included the DST software, from the transaction.

Because the WebSMARTT and inTEAM businesses were complementary instead of competitive, the parties agreed to a co-marketing agreement, which allowed each of them to benefit from selling the other party's services and products. Except for the permitted cross-marketing activities, inTEAM protected its consulting business carve-out and DST software by imposing post-closing non-competition and non-solicitation obligations on Heartland. Because DST had not been fully developed by the time of closing, the parties described its intended uses by referring to technical documents. Heartland also protected its post-closing business with non-compete obligations.

inTEAM's arguments on appeal in favor of being able to compete with Heartland by providing a software product that performs nutrient analysis and menu planning are in direct conflict with the spirit of the overall transaction. As Heartland points out, it never would have paid SL-Tech and Goodman $17 million for a business that inTEAM could compete with directly right after closing. What's worse, according to Heartland, is the CMA. If the Court accepts inTEAM's interpretation of the transaction agreements, Heartland would have agreed to cross-market a software program that competes directly with its WebSMARTT product. Like Goodman and inTEAM, Heartland has also tried to rewrite its non-competition

obligations following closing. With these tensions in mind, we turn to the transaction agreements to decide whether the arguments developed during litigation are supported by the specific language of the transaction agreements.

## III.

### *A.*

inTEAM's Menu Compliance Tool+, later made a part of CN Central,[53] allows school districts to analyze nutrients in school lunch menus, which they then used to demonstrate USDA regulation compliance and obtain Six Cent Certification. To decide whether Menu Compliance Tool+'s nutrient analysis functionality violates the transaction agreement non-competes, two main questions must be answered. First, did the parties carve out nutrient analysis from the transaction as a business currently conducted by inTEAM that could continue after closing? And, if not, did the transaction agreements' non-competes prohibit Goodman and inTEAM from offering this functionality after closing?[54] The parties agree that nutrient

---

[53] As we understand the record, all of inTEAM's software modules, including Menu Compliance Tool+, were combined into one product named CN Central. App. to Opening Br. at 1473 (inTEAM Website Products and Services Page). For purposes of this opinion, we treat CN Central the same as Menu Compliance Tool+.

[54] For the purposes of this Opinion, we treat Goodman and inTEAM the same. Because Goodman is the "Major Shareholder" and "Consultant" under the transaction agreements, and is the CEO of inTEAM, inTEAM's actions are imputed to Goodman. *See* App. to Opening Br. at 317 (CMA § 9.1.1) ("inTEAM shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person . . . ."); *id.* at 380 (APA § 5(n)) ("[N]either the Seller nor the Major Shareholder will engage directly or indirectly, on Seller's or the Major Shareholder's own behalf or as a Principal or Representative of any Person . . . ."); *id.* at 293 (Consulting Agreement § 11(a))

26

analysis software was not part of the business carved out for inTEAM after closing.[55]

We therefore look to the non-compete obligations of the transaction agreements to decide whether a violation occurred.

According to the APA non-compete, Goodman could not compete with an SL-Tech business that SL-Tech performed at the time of closing. The parties agree that the software program Heartland purchased from SL-Tech, WebSMARTT, performed nutrient analysis as of closing. Further, the parties also agree that inTEAM's Menu Compliance Tool+ performs a form of nutrient analysis, which would normally end the dispute in Heartland's favor. Goodman argues, however, and the Court of Chancery found, that each of the software programs perform a different form of nutrient analysis as defined by the USDA, and thus do not compete with each other.

As explained earlier, the USDA accepted three methods for demonstrating compliance with its new regulations—legacy software designed to track nutrients in school meals, like WebSMARTT; a simplified nutrient assessment, like Menu Compliance Tool+; or a manual audit performed by a reviewing state agency.

("[T]he Consultant shall not directly or indirectly, on behalf of himself or on behalf of any other person, firm or business entity . . . .").

[55] *Id.* at 2048 (Goodman Trial Test.) ("Again, built into WebSMARTT was the capability to do nutrient standard menu planning and was the capability to develop a nutrient analysis. So those were the guiding design principles at the time that WebSMARTT was built and at the time of the Heartland closing."); *id.* at 2149 ("One of the components we didn't provide through DST was nutrient analysis.").

Because inTEAM's Menu Compliance Tool+ used an abbreviated form of nutrient analysis when compared to WebSMARTT, the Court of Chancery determined that inTEAM did not violate the non-compete provisions.

The Court of Chancery erred when it strayed from the language of the non-competes into the USDA regulatory certifications. The different paths to Six Cent Certification approved by the USDA do not displace the restrictions of the transaction agreements. Under the APA, Goodman could not engage in a business SL-Tech conducted at closing. At closing, SL-Tech marketed WebSMARTT to school districts to enable them to demonstrate compliance with the USDA guidelines. Nutrient analysis was part of the functionality required by the USDA, which was part of the WebSMARTT software platform. Although Menu Compliance Tool+ used a slimmed down version of nutrient analysis,[56] it nonetheless used nutrient analysis to accomplish the same result—demonstrating compliance with the USDA guidelines.

As the USDA recognized, simplified nutrient assessment "is intended to be a proxy for the nutrient analysis."[57] In our view, any software program that performed

---

[56] Menu Compliance Tool+ track only calories, percent of calories from saturated fat, and sodium. *See* Answering Br. at 40-41. WebSMARTT can analyze thirteen different nutrients including calories, percent of calories from saturated fat, and sodium. App. to Opening Br. at 2402-03. *See also* note 5.

[57] *Directions for Simplified Nutrient Assessment for Lunch*, U.S. Dep't of Agric., at 1-2 (Sept. 2, 2014), *available at* https://www.fns.usda.gov/sites/default/files/cn/SP34-2012assessment_directions.pdf.

nutrient analysis, whether partially or fully, to demonstrate compliance with USDA regulations, competed directly with WebSMARTT, a product purchased from SL-Tech at closing.[58]    Thus, we find that Goodman breached his non-compete obligations by offering Menu Compliance Tool+ to perform any type of nutrient analysis to assist school districts in complying with the USDA guidelines.

Further, inTEAM breached the CMA, and Goodman breached the Consulting Agreement, by offering a product competitive with WebSMARTT.  Under both agreements, neither Goodman nor inTEAM could offer Competitive Services or Products to the SL-Tech business Heartland purchased at closing.  A Competitive Product is defined as "the development, manufacture, or sale of computer software

---

[58] Goodman admitted Menu Compliance Tool+ and its nutrient analysis capabilities were not included in the Functional Design Documents:

Goodman Dep. 263:10-264:20:

| | |
|---|---|
| Counsel: | Is it in the function design documents that are attached to the CMA? |
| Goodman: | Do you have a magic wand? Can you adjust software to regulations that haven't yet been written? |
| Counsel: | I'll tell you what, why don't I ask the questions.  Can you do that? |
| Goodman: | We anticipated what would be required and moved the design very close to what we expected to be the final result as reflected in Exhibits C and D of the CMA dated September 30, 2011.  And there were written plans and intentions to do so in the business plan published for inTEAM in 2010. |
| Counsel: | Okay.  But it's not in the function design documents. |
| | . . . |
| Goodman: | I'm not a magician is the way I will answer that question. |
| Counsel: | How about answering the question: Is it in the function design documents to the CMA? |
| Goodman: | Because I don't have ESP, no. |

and/or POS terminal hardware designed to facilitate (A) accounting and (B) reporting of transactional data functions and management of [] foodservice operations of K-12 schools . . . ."[59]  At trial, Tyson Prescott, the former software development manager at SL-Tech, explained that "transactional data functions" is an industry term of art that includes the ability to analyze nutrients, among other functions.[60]  inTEAM does not dispute Prescott's definition of transactional data functions, except to say that none of the relevant contracts specifically refer to nutrient analysis as a transactional data function.[61]  We therefore find that Goodman breached the Consulting Agreement, and inTEAM breached the CMA, by using Menu Compliance Tool+ to perform nutrient analysis to demonstrate compliance with the USDA regulations for Six Cent Certification.

*B.*

Turning to menu planning, the parties agree that, without the carve-out for inTEAM's DST software, the non-compete provisions of the transaction agreements prohibit Goodman and inTEAM from providing a software product that competes with the menu planning functionality of the WebSMARTT software.  The scope of the carve-out for inTEAM's DST software program is set forth in the Functional

---

[59] App. to Opening Br. at 303.
[60] *Id*. at 2836-38 (Prescott Trial Test.).  Prescott is now the senior manager of software development at Heartland. *Id*. at 2816.
[61] Answering Br. at 39.

Design Documents. Menu planning is referred to in the Functional Design Documents. Thus, the dispute boils down to whether the references to menu planning in the Functional Design Documents were intended to cover the menu planning functionality in Menu Compliance Tool+, such that it could directly compete with Heartland's WebSMARTT software.

The Functional Design Documents for Phase 2 "Milestone B – Menu Planning," use the words "menu item," "menu category," "menu template," and "menu cycle." The menu planning functionality allowed the user to create, copy, and save menu items, menu categories, and place menus into menu cycles. These references led the Court of Chancery to conclude that the DST software was intended to perform the same type of menu planning as the WebSMARTT software. The court did not explore further what menu planning actually meant as part of the DST software program.

To discern the meaning of menu planning within the DST software program, the Court of Chancery should have examined the use of the term "in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*."[62] When menu planning is understood as the term is actually used in the Functional Design Documents, we conclude that Menu Compliance

---

[62] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

31

Tool+ went far beyond what was intended by the Functional Design Documents, and thus impermissibly competes with the WebSMARTT software program.

First, as a basis for comparison, it is useful to understand how WebSMARTT and Menu Compliance Tool+ perform menu planning. In WebSMARTT, a school district inputs recipes and instructions on how to make a dish. As the school district edits the ingredient list, it can immediately see how the cost and nutrient composition of the dish changed. School menu planners can then put menu items together to create menu cycles, and can track how many items are sold versus what was originally projected:



_____

[63] App. to Opening Br. at 59.

32

The school district can also call up a screen to assess whether the nutritional value of the meals meets the USDA standards:



inTEAM's Menu Compliance Tool+ performs many of the same functions, which explains the use of the word "compliance" in its description. The user "enters recipes, menus, documentation and costing from a shared database. As this information is entered[,] compliance is checked in real time to provide immediate, ongoing feedback to the planner."[65] It "allow[s] for a quick and easy search on ingredients, recipes, and menus," and "provide[s] real-time nutrient analysis within

_____

[64] *Id.* at 60.
[65] *Id.* at 1117.

[the] menu planning writing tool as ingredients are being added to recipes."[66] The module can also "automatically calculate and display nutrient information for recipes based on ingredients listed."[67]

Completed menu plans appear as follows:

## Sample Completed Menu

Daily Menu

Sun - 10/11    **Mon - 10/12**    Tues - 10/13    Wed - 10/14    Thur - 10/15    Fri - 10/16    Sat - 10/17    A La Carte S&E    A La Carte Bev

Total Feeding Figure  200  Edit          Projected Average Cost per Meal  Data Missing          **View Cost**

| Meal Component | Recipe Name or Combo Name | Menu Item/ A La Carte | Actual Portion Size | Recipe # or Product Name and Code | Source | Planned # of Servings | Creditable Portion Size | Unit of Measure | Calories (1 serving) | Saturated Fat (1 serving) | Sodium (1 serving) | Total Carbs (grams) | Allergens | Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recipe - Entree | Cheese Pizza | Cheese Pizza | 100g | Super Pizza #6547 | Local | 125 | | | 300 | 5 | 350 | 32 | Milk, Soybeans, Wheat | Edit View Uploads Delete |
| Meat/Meat Alternate | Cheese Pizza | Cheese Pizza | 100g | Super Pizza #6547 | Vendor | 125 | 2 | oz eq. | | | No Data | | Milk, Soybeans, Wheat | Edit Upload Delete |
| Whole Grain- Rich Grains | Cheese Pizza | Cheese Pizza | 100g | Super Pizza #6547 | Vendor | 125 | 2 | oz eq. | | | No Data | | Milk, Soybeans, Wheat | Edit Upload Delete |
| Vegetable Red/Orange | Cheese Pizza | Cheese Pizza | 100g | Super Pizza #6547 | Local | 125 | 0.125 | cup | | | No Data | | Milk, Soybeans, Wheat | Edit Upload Delete |
| Recipe - Entree | Rib Sandwich | Rib Sandwich | 4.5oz | Recipe #105 | Local | 60 | | | 0 | 0 | 0 | 0 | Soybeans, Wheat | Edit Upload Delete |
| Meat/Meat Alternate | Rib Sandwich | Rib w/BBQ Sauce | 70g | B5 #487 | Vendor | 60 | 2 | oz eq. | 160 | 3.5 | 390 | 8 | Soybeans | Edit Upload Delete |
| Whole Grain- Rich Grains | Rib Sandwich | Sub Bun | 58g | Aunt Anns #C567 | Vendor | 60 | 2 | oz eq | 150 | 0.5 | 180 | 28 | Wheat | Edit Upload Delete |
| Recipe - Entree using Calculator View | Chef Salad Demo | Chef Salad Demo | 1 salad | Recipe #906 | Local | 15 | | | 446 | 7 | 1695 | No Data | Milk, Soybeans, Wheat | Edit Upload Delete |
| Meat/Meat Alternate | Chef Salad Demo | Cheese, American | 28g | USDA | Local | 15 | 1 | oz eq. | | | | 2 | Milk | |
| Meat/Meat Alternate | Chef Salad Demo | Ham, Sliced | 112g | Commodity Ham | Local | 15 | 1.5 | oz eq. | | | | 6 | | |
| Whole Grain- Rich Grains | Chef Salad Demo | WH Wheat Roll | 56g | Bread Brand 45 | Local | 15 | 2 | oz eq. | | | | 25 | Soybeans, Wheat | |
| Vegetable Dark Green | Chef Salad Demo | Spinach, Raw | 1/8 cup | USDA | Local | 15 | 0.125 | cup | | | | 0.27 | | |
| Vegetable Dark Green | Chef Salad Demo | Lettuce, Romaine | 2 cups | USDA | Local | 15 | 1 | cup | | | | 3.09 | | |
| Vegetable Red/Orange | Chef Salad Demo | Tomatoes, Grape | 3 Grape, 1/8 cu | USDA | Local | 15 | 0.125 | cup | | | | 1.45 | | |

[68]

When the user opens a menu, the software automatically populates nutrient statistics for that menu:

---

[66] *Id*. at 1126-27.
[67] *Id*. at 1129.
[68] *Id*. at 1795.



69

Having established that WebSMARTT and Menu Compliance Tool+ perform many of the same menu planning functions, we turn to the Functional Design Documents for the DST software to see whether the parties agreed to this type of direct competition after closing. DST Phase 1, which was already being marketed by inTEAM at closing, provided "data warehousing and analysis tool[s] and related professional, maintenance and support services."[70] DST Phase 2 would build on Phase 1 by adding "modeling and pro-forma forecasting tools and related professional maintenance and support services."[71]

---

[69] *Id.* at 1797.
[70] *Id.* at 488 (CMA Recitals).
[71] *Id.*

The focus of DST Phase 2 as a modeling and forecasting tool is confirmed by another description of DST's future development:

> [DST] Phase 2 extends the work that was done in Phase 1. Whereas Phase 1 focuses on historical transactions, Phase 2 looks forward to future periods.
>
> With Phase 2, school systems that installed DST will be able *to leverage menu planning as a tool to project the impact on staffing, equipment, and food/labor costs. They will also be able to model in advance menu plans, work schedules and financials to accurately predict the outcome under a variable set of assumptions.* inTEAM philosophy and best practices drive the design of Phase 2, resulting in a product that allows school administrators to *accurately model future scenarios* and compare/evaluate it against reality.[72]

A sensible reading of the foregoing DST software description would lead one to conclude that DST Phase 2 was intended as an analytics and modeling tool, not a functional tool like WebSMARTT that generates menus and monitors USDA compliance. In other words, menu planning within the DST software was intended to capture current menu plans from programs like WebSMARTT to use as a building block to analyze and model the data. In this way, the products were complementary to each other, not competitive.

The milestones referred to in the Functional Design Documents also confirm this understanding. Milestone A states that "[a]t the inTEAM level, all such screens will fall under a new [Modeling] tab."[73] Milestone B provides that "[i]n Milestone

---

[72] *Id*. at 148 (emphasis added).

[73] *Id*. (brackets in original).

B, the screens required for DAs[74] to model real world or hypothetical scenarios in operations will be built. DAs will be able to create Menu Cycles and combine them with Staff and Equipment to create Operational Models that produce work schedules and food/labor costs."[75]

Our interpretation of the Functional Design Documents—that DST Phase 2 was aimed at analytics and modeling, not first level menu planning and USDA compliance—fits well with the overall scheme of the transaction agreements.[76] It is unreasonable to believe that Heartland would have agreed to let inTEAM market a competitive software program to WebSMARTT, a software program it paid $17 million to acquire. Further, Heartland would never have agreed under the CMA to market a competitive software program to its school district customers.

The references to menu planning in the Functional Design Documents are also better understood by reviewing the user guide inTEAM created during development of the DST software.[77] The menu plan module contains six drop down tabs: Setup, Menu Plan, Staffing Plan, Financial Model, Input Actual Data, and KPI/s

---

[74] "DAs" means District Administrators.
[75] App. to Opening Br. at 148 (Functional Design Documents).
[76] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *10 (Del. Ch. July 11, 2011) (Purchase Agreement terms interpreted according to "the commercial realities and business context facing the parties at the time the Purchase Agreement was negotiated and consummated.").
[77] The draft user guide is from September 2007, but inTEAM has relied on the guide to describe "DST's menu planning and menu modeling functions" and DST's "menu creation, editing and export functions." Answering Br. at 18.

Financial.[78]  Under the "Menu Plan" tab, there are five options: Work Methods &

Productivity; Items; Menu Plan Wizard; Update, Delete Menu plans; and Menu Plan

Reports.[79]



The "Items" tab under "Menu Plan" refers to menu items.  There, the name of the

menu item, its code, cost, and price are listed, along with whether the item will need

to prepared on-site, and if so by what method:[81]

---

[78] App. to Answering Br. at 1012.
[79] *Id*. at 991.
[80] *Id*.
[81] *Id*.



82

Under "Menu Plan Wizard," the user can upload menu item data, menu plan data, or proceed manually. Data can be uploaded from menu planning software, like WebSMARTT:



83

---

[82] *Id.*
[83] *Id.* at 994.

After the data is entered, DST generates reports. The "Menu Plan Report" shows the quantity of menu items that will theoretically be sold during breakfast, lunch, and a la carte.[84] Unlike the WebSMARTT platform, the Menu Plan Report generated by DST software does not contain recipes, ingredients, directions on how to make the meal, nutrient values, or facilitate USDA compliance:


[85]

After the menu planning information is imported into the DST software, DST would generate "operational models," like the reports set forth below:[86]

---

[84] *Id*. at 1003.

[85] *Id*. at 1005.

[86] "To create an Operational Model, the DA user would first create Menu Cycles such as [Elementary School Breakfast] to [2 Week Cycles High Schools] and then apply them to a time period in order to analyze food and labor costs and efficiencies." App. to Opening Br. at 150 (Functional Design Documents); *id*. at 272 (inTEAM Sept. 12, 2011 Presentation to Office of Hawaii Child Nutrition Programs—ART Project) (DST is an "[a]nalytics engine built over a data warehouse with" the ability to "[l]everage[] disparate systems that are already collecting required data." It also has "[r]obust data mining and reporting capabilities" with the ability to "'slice and

40

## DST Building Blocks: KPI's & Reports

### Example Reports

- Enrollment, Attendance, and Eligibility
- Meal Participation
- Participation by Eligibility
- Net change in Eligibility Post Verification
- Percent Meal Revenue by Funding Source
- Meal Revenue by Program
- Total Meal and Ala Carte Revenue
- Revenue Per Student in Attendance
- Meals Per Labor Hour
- Total Expense Report
- Total Cost as a Percent of Revenue
- Food Cost as a Percent of Revenue
- Labor Cost as a Percent of Revenue
- Other customized, on-the-fly reports



87

As the foregoing screenshots demonstrate, DST's primary function was not to generate a first level menu plan similar to a plan generated with the WebSMARTT software. Instead, DST software was intended to capture menu planning data from other sources to analyze and model the data.

inTEAM's internal documents confirm the analytical focus of the DST software. In an internal document regarding the implementation of DST, DST was described as a different platform than WebSMARTT:

> DST is not intended to replace the current [point of sale] or back of the house transactional software. It simply uses data from the current transactional systems to identify limitations in [the] current operating

---

dice' data in thousands of ways," "[b]enchmark[] to identify outliers," and "[i]dentify areas where corrective action should be taken.").

[87] *Id*. at 280.

process and allows the User to test the effect of making incremental changes in one or more of these processes.

. . .

It is widely accepted in the industry that **the menu is the driving force affecting all other aspects of a quantity foodservice operation.** Thus, capturing the current **school based menu plan[] is the first step** in initiating the "what if" modeling capabilities of DST. Again, this process will occur with differing levels of inTEAM consultant involvement.[88]

The document further explains that:

Within the "modeling environment" of DST, the District User can develop new menus or make menu item changes and immediately observe the impact on other aspects of the foodservice operation. Changes to item and menu records will be reflected in Financial Models. Here are a few of the questions that can be answered in the modeling environment: What happens when raw food costs or labor rates increase? What is the impact of shifting production to a central kitchen? Does staff have enough time to handle the new menu item preparation tasks? Do all the kitchens have the equipment needed to produce the menu item? Do all kitchens have staff with the necessary skills to produce the new menu? Working in the simulated environment of DST, the User can find out answers to these questions prior to rolling out the menu in "real life."

…

The DST modeling component allows an inTEAM coach and the district foodservice director to examine existing systems, propose incremental changes for improvement and simulate the changes in a "virtual" environment before rolling out the plans in real life. **Implementing the modeling portion of DST can begin with an inTEAM coach demonstrating to a director and/or manager on**

---

[88] *Id*. at 942 (inTEAM Internal Document) (emphasis in original).

**how to systematically evaluate options to improve program performance**.[89]

inTEAM created an entirely different product from that envisioned by DST, knowing that it was "invading WebSMARTT territory."[90] The inTEAM carve-out for DST anticipated that DST would use first level menu plan data from other sources, such as WebSMARTT, to create models that would project how staffing, equipment, and other costs would be affected based on changes to the menu. It did not contemplate the act of first level menu planning itself and its use to establish compliance with USDA regulations. Because the Menu Compliance Tool+ in CN Central goes far beyond what is carved out for the DST software in the agreements, Goodman and inTEAM breached the non-competes in the transaction agreements.

---

[89] *Id*. at 945-46, 950 (emphasis in original); *see also id*. at 884 (DST is "designed to supplement inTEAM offerings by collecting data from point of sale, back of the house, financial management, and payroll systems to help districts analyze data from disparate systems."); *id*. at 943 (emphasis in original):

> Select the **Import Defaults from CSV** button to import a list of food items and corresponding descriptions from a pre-existing district food item spreadsheet. Ideally the item list would be **obtained by exporting data from the foodservice program's current [point of sale] system or captured from cycle menu plans entered in an Excel format. Note: For DST purposes the menu items entered are the generic descriptions of foods on the menu such as cheeseburger, cheese pizza, . . . etc.** Since DST does not evaluate specific recipes nor does it perform an independent nutritional analysis, the exact manufacturer or composition of the item is not needed.

[90] *Id*. at 966 (Nov. 11, 2012 E-mail from Griffin) ("But then we can't be straight up and say menu planning because that would be invading WebSMARTT territory!"); *id*. at 2462-64 (Griffin Trial Test.) (admitting menu planning capability was added in 2012).

**IV.**

Next, Heartland argues that the Court of Chancery erred by finding it breached the non-compete in the CMA when it collaborated with Colyar. Heartland also challenges the length of the injunction the court ordered to remedy the breach.

*A.*

The Court of Chancery found that Heartland indirectly breached its non-compete and exclusivity obligations under the CMA when it "collaborated with Colyar, a direct competitor of inTEAM, to create an interface between Heartland's Mosaic Menu Planning product and Colyar's administrative review software for the express purposes of 'provid[ing] state auditors a consistent view of school district menu data so that they can perform audits in a more efficient manner' and offering 'access to school district menu data as needed in performing an audit and providing recommendations.'"[91] According to the court, such action fell within the scope of providing "unique state value added functionality."[92]

Under the CMA, Heartland cannot "engage, directly or indirectly . . . in providing services or products competitive with the inTEAM Business."[93] Within the definition of the inTEAM Business is "unique state value added functionality."[94]

---

[91] *inTEAM Assocs.*, 2016 WL 5660282, at *17 (internal citation omitted).
[92] *Id*. at *17-18.
[93] App. to Opening Br. at 317.
[94] *Id.* at 330.

The Court of Chancery found that "unique state value added functionality" included "the ability to build products that assist state agencies in conducting their administrative review process."[95]

On appeal, Heartland argues that the Court of Chancery impermissibly relied on trial testimony to define "unique state value added functionality." According to Heartland, it presented contrary testimony showing "that administrative review software was not contemplated in the [CMA]."[96]

But, it was for the Court of Chancery as the "trier of fact to assess the credibility of the conflicting testimony and the weight it was to be given."[97] The court credited Goodman's testimony that he understood the phrase "unique state value added functionality" to mean the ability to "'allow [] [state reviewers or auditors] immediate access to records that they needed to review electronically that were created and generated generally at the school district level,' causing 'a breakthrough in the way audits were conducted and the value that was added for state agencies.'"[98] The court also cited Goodman's testimony that he believed the phrase meant "during an administrative review related to menu plans, in particular,

[95] *inTEAM Assocs.*, 2016 WL 5660282, at *18.
[96] Opening Br. at 44.
[97] *Acme Markets, Inc. v. Revello*, 547 A.2d 131, 1988 WL 71448, at *1 (Del. June 20, 1988) (TABLE).
[98] *inTEAM Assocs.*, 2016 WL 5660282, at *16 (internal citation omitted).

the ability to have school districts within that state either to utilize the third-party systems that they already had, or allow them to utilize our menu compliance tool directly so that the data feed was always available at the state level."[99]

The court also relied on Janet Luc Griffin,[100] who testified that the "additional state value" of inTEAM's Menu Compliance Tool+ enabled state agencies to access the districts' menu information directly and, as a result, they could modify the menus within the system to assure the districts are in compliance before the agency comes on-site to do a review.[101]

> As the Court of Chancery held:
>
> Heartland does not rebut this testimony and instead argues that because this functionality did not exist until 2014, three years after the parties signed the Co-Marketing Agreement, it could not be part of the "state value added functionality" described in the agreement. This argument fails because the definition of inTEAM Business, which references Exhibit C and discusses a "future release" of DST Phase 2 as defined in the Functional Design Documents, anticipated the development of a product with functionality that did not exist at closing.
>
> Heartland also argues "no inTEAM witness made any effort to show that the functionality of inTEAM's administrative review software module was identified in the functional design documents." This argument ignores the first part of Goodman's testimony, which specifically discusses Exhibit C (and, by reference, the Functional Design Documents). This argument also fails to address the language of the Functional Design Documents, which state "District Administrators [] will configure their districts within DST ... State Agency Administrators (SAs) will ... be able to access the new district and building setup screens." Heartland offers no testimony or evidence

---

[99] *Id.*
[100] Griffin is the Director of Business Development at inTEAM.
[101] *inTEAM Assocs.*, 2016 WL 5660282, at *16.

46

to rebut these descriptions of the "unique state value added functionality" of the inTEAM Carve-Out, and inTEAM meets its burden to show it bargained for this functionality at the time of the transaction.

By January 2011, inTEAM was contemplating a future release of DST Phase 2 that would have greater functionalities than existed at the time of the agreement. Exhibit C and the Functional Design Documents expressly reference those functionalities, which included the ability to plan menus, generate production records, and assist administrative reviews. Heartland agreed to incorporate Exhibit C and the Functional Design Documents into the inTEAM Business definition described in the Asset Purchase Agreement and the Co-Marketing Agreement, and it cannot now simply ignore what those documents state.[102]

The Court of Chancery's conclusion is supported by the record and thus was not error.[103]

*B.*

Heartland next argues that the length of the injunction is inappropriate. We review the Court of Chancery's issuance of a permanent injunction for abuse of discretion.[104] An abuse of discretion occurs when a court has "exceeded the bounds of reason in view of the circumstances" or has "ignored recognized rules of law or practice so as to produce injustice."[105]

---

[102] *Id.*

[103] *Honeywell Int'l Inc.*, 872 A.2d at 950 ("To the extent the trial court's interpretation relies upon findings extrinsic to the contract, or inferences drawn from those findings, this Court will defer to the trial court's findings unless they are not supported by the record.").

[104] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380 (Del. 2014).

[105] *Firestone Tire & Rubber Co. v. Adams*, 541 A.2d 567, 570 (Del. 1988).

The Court of Chancery found that Heartland's breach began on March 17, 2014, when its relationship with Colyar first began, and lasted until September 8, 2015, when Heartland announced the TDA had not selected its proposal. Because the breach lasted roughly eighteen months, the Court of Chancery granted an injunction extending the non-compete agreement for eighteen months to give inTEAM the full benefit of its bargain.

Heartland argues that it was improper to use March 17, 2014 as the start of the breach because that was the date a Colyar executive reached out to Heartland. According to Heartland, "receiving an unsolicited e-mail from a third party should not constitute a breach of the [CMA]."[106] But the Court of Chancery stated that it "did not rely on one e-mail alone" to determine whether Heartland breached the CMA.[107] "[R]ather, there was systemic behavior that led the Court to its conclusion. The [Colyar] e-mail served as an element, among others, to inform the Court of when this breach began . . . ."[108]

The court considered the e-mail and the events thereafter to determine when the breach began. Although Colyar initiated the first interaction, Heartland did not decline Colyar's invitation. Instead, Heartland and Colyar opened the dialogue that

---

[106] Opening Br. at 46.
[107] *inTEAM Associates, LLC v. Heartland Payment Sys., Inc.*, 2016 WL 6819734, at *2 (Del. Ch. Nov. 18, 2016).
[108] *Id*.

led to the underlying breach. The injunction measured Heartland's breach by reference to its collaborative efforts with Colyar. Thus, the Court of Chancery did not "exceed the bounds of reason" or "ignore recognized rules of law" by finding the breach began on March 17, 2014 and ran until September 8, 2015, when Heartland announced the TDA had not selected its joint proposal with Colyar.

## V.

The Court of Chancery found that Goodman breached the non-solicitation provision in the Consulting Agreement by encouraging St. Paul Public Schools to terminate its relationship with Heartland.[109] Thus, Heartland argues that under the Consulting Agreement, it is entitled to recover the full amount it paid to Goodman for his consulting services.

Heartland agreed to pay Goodman a salary of $16,667.67 per month for three-years during the Consulting Agreement, totaling $600,000. If Goodman breached certain sections of the Consulting Agreement, including the non-solicitation provision, Heartland had "no obligation to pay the Consultant any compensation set forth herein."[110]

The Court of Chancery held that Goodman lost his entitlement to his consulting fees when he began breaching the agreement in July 2014. Thus,

---

[109] Goodman does not dispute the Court of Chancery's finding that he breached the Consulting Agreement on appeal.

[110] App. to Opening Br. at 291 (Consulting Agreement § 3).

49

Heartland was entitled to recover $50,003.01, representing the fees Heartland paid Goodman from July to September 2014—the last three months of the Consulting Agreement. But, according to Heartland, the use of the word "any" meant Goodman had to disgorge the entire $600,000 in compensation he received.

We find that the Court of Chancery correctly interpreted the forfeiture provision as prospective only and did not require Goodman to return the fees he was paid before the breach occurred. The Consulting Agreement does not contain a clawback provision, and at oral argument counsel admitted there was no evidence in the record to show such a provision was specifically bargained for.[111] Heartland is thus only entitled to recoup the fees it paid during the three months Goodman was in breach of the Consulting Agreement.

## VI.

On cross-appeal, inTEAM argues that the Court of Chancery erred by finding that it was not entitled to fee shifting under the CMA. The Court of Chancery found that a cap limiting liability to "the Fees previously paid by the other Party pursuant to this Agreement," barred inTEAM's ability to collect attorneys' fees because inTEAM had not paid Heartland any fees under the CMA.

Section 6.5 of the CMA includes a fee shifting provision that states "the breaching party shall be liable and pay to the non-breaching Party the reasonable and

---

[111] Oral Arg. at 14:42-15:36.

verifiable legal fees and costs incurred in connection with such litigation or proceeding, including an appeal therefrom. . . ."[112]  Here, we have found that both parties have breached the CMA.  At oral argument, the parties agreed that if both parties are in breach, the provision is inapplicable.[113]  Thus, this argument is moot.

## VII.

We reverse the Court of Chancery's determination that Goodman did not breach the non-compete provisions of the APA and the Consulting Agreement, and reverse its determination that inTEAM did not breach the CMA.  Otherwise, the judgment of the Court of Chancery is affirmed.  We remand to the Court of Chancery for further proceedings consistent with this opinion.  Because of the passage of time, we leave it to the Court of Chancery to fashion a remedy adequate to compensate Heartland for Goodman's breach of the APA and Consulting Agreement, and inTEAM's breach of the CMA.  Jurisdiction is not retained.

In a footnote, inTEAM and Goodman argue that if we find that they breached the non-compete provision, we must remand to the Court of Chancery to allow it to consider certain affirmative defenses it did not reach because of its original finding that the non-compete was not breached.  We agree with this argument but only to a confined extent.  For starters, Goodman may not reassert affirmative defenses to the

---

[112] App. to Opening Br. at 315.
[113] Oral Arg. at 18:50-20:10.

Court of Chancery's finding that he violated the second clause of the non-solicitation provision. The Court of Chancery specifically addressed and rejected his affirmative defenses to the non-solicitation provision violation.[114] Goodman has not challenged that finding on appeal and it thus stands. But, to the extent that inTEAM and Goodman properly raised and briefed affirmative defenses at trial addressed to the alleged violation of the non-compete and the Court of Chancery did not reach them because it found no violation, they are free to reassert them in the course of the Court of Chancery's determination of what relief, if any, to grant for inTEAM's and Goodman's violation of the non-compete.

---

[114] *See inTEAM Assocs.*, 2016 WL 5660282, at *26.