# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AB STABLE VIII LLC, | § | |
| | § | No. 71, 2021 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2020-0310 |
| MAPS HOTELS AND RESORTS | § | |
| ONE LLC, MIRAE ASSET CAPITAL | § | |
| CO., LTD., MIRAE ASSET | § | |
| SECURITIES CO., LTD., MIRAE | § | |
| ASSET GLOBAL INVESTMENTS, | § | |
| CO., LTD., and MIRAE ASSET LIFE | § | |
| INSURANCE CO., LTD., | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |
| | § | |

Submitted: September 15, 2021
Decided: December 8, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Raymond J. DiCamillo, Esquire, Kevin M. Gallagher, Esquire, Sarah A. Clark, Esquire, John M. O'Toole, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Theodore N. Mirvis, Esquire, William Savitt, Esquire (*argued*), Sarah K. Eddy, Esquire, Ryan A. McLeod, Esquire, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; Theodore B. Olson, Esquire, Amir C. Tayrani, Esquire, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C.; Adam H. Offenhartz, Esquire, and Marshall R. King, Esquire, GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Attorneys for Appellant AB Stable VIII LLC*.

A. Thompson Bayliss, Esquire, Michael A. Barlow, Esquire, April M. Kirby, Esquire, Stephen C. Childs, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Kathleen M. Sullivan, Esquire (*argued*), Michael B. Carlinsky, Esquire, William B. Adams, Esquire, Christopher D. Kercher, Esquire, Rollo C. Baker IV, Esquire, Todd G. Beattie, Esquire, Jonathan E. Feder, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; and Kap-You Kim, Esquire, PETER & KIM ATTORNEYS AT LAW, Seoul, South Korea; *Attorneys for Appellees MAPS Hotels and Resorts One LLC*, *Mirae Asset Capital Co*., *Ltd*., *Mirae Asset Securities Co*., *Ltd*., *Mirae Asset Global Investments*, *Co*., *Ltd*., *and Mirae Asset Life Insurance Co*., *Ltd*.

**SEITZ**, Chief Justice:

MAPS Hotel and Resorts One LLC (the "Buyer") agreed to purchase fifteen hotel properties from AB Stable VIII LLC (the "Seller") for $5.8 billion. A closing delay brought an unexpected problem—the novel coronavirus COVID-19 and the damage it inflicted on the hospitality industry. In response to the pandemic and without securing the Buyer's consent, the Seller made drastic changes to its hotel operations. The transaction was also plagued by problems with fraudulent deeds covering some of the hotel properties. The Buyer eventually called off the deal, relying on the Seller's failure to comply with the sale agreement.

The Seller sued in the Court of Chancery to require the Buyer to complete the transaction. The Court of Chancery concluded that the Buyer could terminate the sale agreement because the Seller breached a covenant and a condition in the sale agreement. First, according to the court, the Seller violated the ordinary course covenant by failing to operate in the ordinary course of its business—closing hotels, laying off or furloughing thousands of employees, and implementing other drastic changes to its business—without the Buyer's consent. And second, a condition requiring title insurance for the hotel properties failed because the title insurers' commitment letters had a broad exception covering the fraudulent deeds, and the Buyer did not cause the failure.

3

On appeal, the Seller argues that it satisfied the Ordinary Course Covenant because the covenant did not preclude it from taking reasonable, industry-standard steps in response to the pandemic; the court's ruling negated the parties' allocation of pandemic risk to the Buyer through the Material Adverse Effect provision; and its breach of the notice requirement in the covenant was immaterial. The Seller also claims that the Court of Chancery gave too expansive a reading to the exception in the title insurance condition, or, alternatively, that the court incorrectly found that the Buyer did not contribute materially to its breach.

We affirm the Court of Chancery's judgment. The court concluded correctly that the Seller's drastic changes to its hotel operations in response to the COVID-19 pandemic without first obtaining the Buyer's consent breached the ordinary course covenant and excused the Buyer from closing. Because the Seller's failure to comply with the ordinary course covenant is dispositive of the appeal, we do not reach whether the Seller also breached the title insurance condition.

I.

Appellee AB Stable VIII LLC is an indirect subsidiary of Dajia Insurance Group, Ltd. ("Dajia").[1] Dajia is a corporation organized under the laws of the People's Republic of China and is the successor to Anbang Insurance Group, Ltd.

---

[1] The facts are drawn from the Court of Chancery's November 30, 2020 opinion unless otherwise stated. *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020).

("Anbang Insurance")—also a corporation organized under the laws of the People's Republic of China. This decision will refer to Dajia and Anbang Insurance as "Anbang." Anbang, through AB Stable VIII LLC (the "Seller"), owns all the member interests in Strategic Hotels & Resorts LLC ("Strategic" or the "Company"), a Delaware limited liability company. Strategic owns all the member interests in fifteen other LLCs, each of which owns a luxury hotel in the United States.

After leadership changes in 2018 and new regulations restricting Chinese companies from owning overseas investments, Anbang decided to divest itself of its U.S. hotels, and opened bidding for Strategic in April 2019. Anbang received first-round bids from seventeen potential bidders by early May 2019. Mirae Asset Financial Group ("Mirae"), a Korea-based financial services conglomerate with over $400 billion in assets under management, emerged as a potential acquirer. On August 5, 2019, Mirae made its final bid—$5.8 billion to acquire a 100% interest in Strategic. During the sale process, Mirae created a subsidiary, MAPS Hotels and Resorts One LLC, "exclusively for the purpose of acquiring [Strategic]."[2] This decision will refer to MAPS as the "Buyer."

Unknown to Mirae at the time of its final bid, Anbang and its legal counsel, Gibson Dunn & Crutcher LLP ("Gibson Dunn"), had become aware of fraudulent

_____

[2] *Id.* at *16.

5

deeds linked to six of the hotels owned by Strategic. Anbang had been in litigation with the perpetrator of the fraudulent deeds, Hai Bin Zhou, for over ten years in five different countries, and knew about some of the fraudulent deeds as early as December 2018.[3] The day after Mirae made its final bid, Anbang, Gibson Dunn, and Strategic exchanged "a flurry of . . . communications" about the deeds and how to disclose them, communications that continued throughout the coming days.[4]

On August 16, 2019, Anbang's lead real estate attorney from Gibson Dunn called Mirae's lead counsel at Greenberg Traurig, LLP to tell him Gibson Dunn "had recently learned that a twenty-something-year-old Uber driver with a criminal record had recorded deeds against [some of Strategic's] Hotels."[5] Despite knowing about the issue for months, and knowing far more about the perpetrator of the fraud than he represented on the call, Anbang's counsel characterized the title issue as a minor problem, a "nuisance."[6] Shortly after, the Seller shared minimal information about

---

[3] The litigation was mainly centered on Anbang's trademarks. Hai Bin Zhou, who often went by "Andy Bang," had registered similar trademarks in the U.S. and elsewhere and pursued an international litigation campaign against Anbang. Anbang was aware of the litigation, and since 2008 had been disputing rights asserted by Zhou's corporate affiliates in China, with high-level Anbang officials making appearances in these suits. Zhou brought sixteen cases against Anbang between 2008 and 2019, including a case in the United States which Anbang had contested before withdrawing in 2019.

[4] *AB Stable*, 2020 WL 7024929, at *16.

[5] *Id.* at *17. While Greenberg Traurig had identified the deeds in July 2019 while reviewing title commitments, the information in the deeds led the team to believe the deeds were transfers between affiliates, rather than frauds perpetrated on the hotels. *Id.*

[6] *Id.* The Court of Chancery found the representation that Anbang's team's lead real estate attorney had only recently learned of the deeds was untruthful because the attorney received the title reports in December 2018, nine months earlier. Likewise, the Court of Chancery found the story that an Uber driver was at the heart of the fraudulent deeds (as the team already knew of the association

6

the fraudulent deeds with the Buyer through the data room. On August 20, 2019, the parties entered into an exclusivity agreement.

At the same time, a group of corporations associated with Zhou (the "DRAA Petitioners") filed an action in the Court of Chancery against Anbang and affiliated entities. The Court of Chancery referred to this suit as the "DRAA Chancery Action."[7] The action centered around a document apparently fabricated by Zhou (the "DRAA Agreement"), containing an elaborate narrative that Anbang leadership had agreed to give the DRAA Petitioners control over certain Anbang assets, including the Strategic hotels claimed in the fraudulent deeds.[8] Gibson Dunn learned of the DRAA Chancery Action the day it was filed, but did not disclose it to Greenberg Traurig or Mirae.

---

with Zhou) was not accurate, as well as Anbang's counsel's claim that he had told Mirae's counsel "everything that they knew." *Id*.

[7] This action (and the fraud perpetuated upon Delaware and California courts) is discussed at length in the Court of Chancery's opinion. *Id.* at *17-19, *21-33. It involved prior filings in the Delaware Superior Court, an action filed in Alameda County, California, and default judgments in California for the hotels based on pages misleadingly ripped from Delaware filings. While the litigation was extensive and complicated, Gibson Dunn knew about the actions throughout, as it represented Anbang in the different courts, and appeared in the actions throughout 2019.

[8] In relevant part, the DRAA Agreement pledged billions of dollars on behalf of Anbang to Zhou's entities, stemming from the trademark litigation between the parties and secured by Anbang's ownership interests in subsidiaries and properties (including some of the hotels). The DRAA Agreement was allegedly "trigger[ed]" by events that had already occurred and granted Zhou's corporate entities a "durable power of attorney" for Anbang. *Id.* at *9. The DRAA Agreement was governed by arbitration under the DRAA, the Delaware Rapid Arbitration Act—hence, the DRAA Agreement.

Meanwhile, the primary title insurer at the time investigated the fraudulent deeds and "deemed the risk uninsurable."[9]  Greenberg Traurig pursued new title insurance, and an agent managed to cobble together a group of title insurers (the "Title Insurers"), who agreed to provide insurance if Anbang could expunge the fraudulent deeds and quiet title to the hotels.  At this point, Greenberg Traurig told Mirae's group of debt financing lenders (the "Lenders") about the fraudulent deeds. The Lenders refused to provide financing.  They took what they described as "a very hardline position" that the group could not "fund into a deal with a cloud on title."[10] Mirae, therefore, would not have the funds to complete the purchase under the existing timetable.

On September 10, 2019, the Seller and the Buyer executed a Sale and Purchase Agreement (the "Sale Agreement").  In it, the Seller agreed to sell all its member interests in Strategic to the Buyer for $5.8 billion (the "Transaction") at a time to be determined.  In light of the fraudulent deeds and lack of debt financing, the Sale Agreement pushed off closing to provide enough time to quiet title and allow the Buyer to obtain financing, added a "Title Insurance Condition" to "enabl[e the] Buyer to obtain title insurance that either did not contain an exception from coverage for the Fraudulent Deeds or which included an exception and then

---

[9] *Id.* at *18.
[10] *Id.* at *19.

affirmatively provided coverage through an endorsement," and included a "Litigation Plan" for Anbang and Gibson Dunn to address the fraudulent deeds.[11]

In September 2019, Gibson Dunn filed actions in Alameda, California to quiet title to the hotels subject to the fraudulent deeds, hoping to resolve the issues there. But in October and November 2019, attorneys in Delaware, representing the DRAA Petitioners, filed documents in the DRAA Chancery Action purporting to be arbitration awards. These documents entitled the DRAA Petitioners to billions of dollars secured by Anbang properties, including the hotels owned by Strategic. An attorney then commenced an enforcement action in the Delaware Superior Court using these documents, which he called "confirmed final judgment[s]" from the DRAA Chancery Action.[12]

On December 6, 2019, an attorney associated with Zhou requested recognition of the "judgments" in California by using mislabeled copies of the Superior Court filings, which a California clerk of court granted (the "California Judgment"). Gibson Dunn and Anbang became aware of the California Judgment on December 11 and 12, respectively. They did not tell Greenberg Traurig, despite discussions acknowledging the seriousness of these filings and internal questions about whether the matters should be disclosed. Greenberg Traurig and Mirae were kept in the dark

---

[11] *Id.* at *3.
[12] *Id.* at *25.

about the vast majority of the litigation, as well as information Anbang and Gibson Dunn were accumulating on Zhou. When Gibson Dunn updated Greenberg Traurig about the quiet title actions for the fraudulent deeds, it did not mention the Delaware litigation or the California Judgment. Gibson Dunn did, however, report default judgments in the quiet title actions, appearing to resolve the problems with the hotels and the fraudulent deeds to the best of Mirae's knowledge. Gibson Dunn repeated this tactic with the Title Insurers.

The Title Insurers—based on their limited information—stated that they were prepared to remove the exceptions to title for the fraudulent deeds if a) the period when the defendants could appeal the quiet title default judgments expired, and b) the Seller confirmed in writing that no additional communication from any of the defendants or their counsel had been received. Greenberg Traurig also believed that, once the time for appeal expired, all title issues would be resolved. Based on this understanding, the parties planned to close at the end of March 2020.

In December 2019, the Buyer told the Seller that it was restarting its search for debt financing, and by mid-February 2020, the Buyer was ready to confirm the financing commitments. Gibson Dunn told Greenberg Traurig that all closing conditions should be met by March 15, 2020. Greenberg Traurig therefore suggested, and Gibson Dunn agreed to, April 1, 2020 as a target closing date. On

February 18, 2020, the Buyer received the final versions of the financing documents from Goldman Sachs, Mirae's lead lender.

That same day, however, Goldman Sachs' counsel notified Gibson Dunn that Goldman Sachs had "become aware of a series of Delaware cases filed against Anbang that seem to relate to the Strategic portfolio" and sent Gibson Dunn the TRO application from the Delaware litigation (a TRO application that Gibson Dunn itself had filed).[13]  Goldman Sachs asked for a call to understand better what appeared to Goldman to be new developments.  Gibson Dunn refused.  Meanwhile, the Seller gave formal notice to the Buyer that all conditions to closing would be satisfied as of March 15, so the parties should prepare for closing soon thereafter.  Mirae and the Title Insurers—again, without knowledge of the extensive litigation—supported that schedule.  Mirae proposed April 6, 2020, as the closing date.

On February 20, 2020, with committed financing ready to go, Mirae asked Goldman Sachs for the final wiring information and fee amounts.  At this eleventh-hour point, Goldman Sachs told Jones Lang Lasalle Americas, Inc. ("Jones Lang")—Mirae's financial advisor—about the Delaware cases.  Jones Lang informed Mirae, and the process came to a halt.  The commitment letters were not signed, and the signing was tentatively pushed off to February 24 for Mirae and the Lenders to

---

[13] *AB Stable*, 2020 WL 7024929, at *33 (quoting from the record).

investigate. Goldman Sachs also forwarded the litigation documents in its possession to Greenberg Traurig.

On a February 21, 2020 call with Greenberg Traurig and the Lenders' counsel, Gibson Dunn called the case a fraud based on a "bizarre trademark dispute" and characterized the Delaware proceedings as "insignificant" and "not a big deal."[14] Gibson Dunn obfuscated the connections between the litigation and the Transaction, even in the face of direct questioning.[15] Based on these representations, Greenberg Traurig and Mirae concluded that the Delaware and California litigation posed little to no risk to the Transaction.

Meanwhile, the COVID-19 pandemic arrived on the world stage. Market upheaval was setting in and on February 26, 2020, Goldman Sachs informed Mirae that committed financing was "off the table."[16] Strategic's hotel business also started to feel the effects of COVID-19 cancellations. On February 28, 2020, Greenberg Traurig found a letter filed in the Court of Chancery three days earlier, signaling that DLA Piper LLP was considering whether to enter an appearance in the DRAA

---

[14] *Id.* at *34.

[15] "Kim asked Li to explain, telling him '**We also need to know ASAP if this is about the Strategic Portfolio.**' Li responded evasively, saying 'We don't think there's anything that your side should be concern[ed] with.' Kim followed up: '[C]an we take it that, whatever it is, it is NOT about the Strategic Portfolio?' Li responded that the DRAA Chancery Action involved a 'fraudulent arbitration judgment falsified by some criminals regarding Anbang's use of the Anbang trademark in the US' and that Gibson Dunn would provide the 'necessary details.'" *Id.* (citations omitted).

[16] *Id.* at *35.

Chancery Action. This letter from DLA Piper's lead Delaware attorney (the "DLA Letter") also gave Mirae and Greenberg Traurig reason to believe Anbang and Gibson Dunn had not been forthright about matters affecting the Transaction. As an example, it referred to the DRAA Agreement and other litigation with Zhou—which DLA Piper had determined Anbang had been not only aware of but involved in for years.

Anbang also already knew about the DLA Letter. It had filed a response in the DRAA Chancery Action, and "[f]or the first time, Anbang began to share [with the court] some of what it knew about Hai Bin Zhou and his associates . . . ."[17] In light of the DLA Letter, Mirae and Greenberg Traurig concluded that the risk posed by the Delaware litigation could not be evaluated without the DRAA Agreement. For weeks afterward, they sought a copy of the DRAA Agreement from Anbang, to no avail.

As the process stretched into March 2020, COVID-19 continued to wreak havoc on the market, and debt funding became unavailable. A bridge loan emerged as the only remaining option, but it was unclear whether one would be available. Some of the Lenders began to back away from negotiations, refusing to bid when Goldman Sachs sent around a term sheet. And market conditions were changing quickly—by the time a lender's internal committee approvals could be attained,

[17] *Id.* at *38.

13

terms were already outdated. Strategic's financial performance was also suffering due to decreases in travel, and its ability to refinance its debt in the ordinary course of business became uncertain. On March 24. 2020, Strategic temporarily closed two of the hotels. Other hotels operated in a "closed but open" fashion.[18]

Against this backdrop, Mirae proposed pushing closing by three months. Anbang insisted on closing before April 8, 2020. Alternatively, Anbang would accept a three-month delay on certain conditions: that Mirae (1) double its deposit; (2) agree that all closing conditions were either met or waived; (3) agree that no purchase price adjustments were required; (4) freeze the balance sheet date for calculating the estimated purchase price; and (5) compensate Anbang roughly $400 million in funding costs. Separately, Gibson Dunn told Greenberg Traurig that Anbang was prepared to litigate the matter.

To Mirae, Anbang's counterproposal was so drastic it served as a rejection, and Mirae rejected Anbang's terms on the day they were proposed. Mirae's response also pointed out that by failing to disclose the Delaware and California litigation, the

---

[18] *Id.* at *40. "The hotels stopped all food and beverage operations except for room service, which was limited to 'breakfast, lunch and dinner with no overnight operations.' The hotels shut down or limited all other amenities, including gyms, pools, spa and health club operations, recreational activities, club lounge operations, valet parking, retail shops, and concierge and bellhop services. Strategic slashed employee headcount, with over 5,200 full-time-equivalent employees laid-off or furloughed. The remaining employees saw their work weeks shortened, were encouraged to take vacation or paid time off, and had any pay increases deferred until further notice. Across many areas, [the] Seller reduced hotel operations to skeleton staffing. [The] Seller limited engineering coverage to safety and OSHA issues, and the Hotels' front desks assumed responsibility from call centers for all calls." *Id.* at *75-76 (quoting the record) (citations omitted).

Seller may have impacted the Title Insurers' willingness to provide title insurance—a closing condition to the Transaction. Mirae again asked for a copy of the DRAA Agreement so that it could assess the risk of the Delaware cases. Anbang replied that it had complied with all disclosure obligations, said it did not possess the DRAA Agreement, and reiterated the threat of litigation. The Seller continued to seek financing through March and early April 2020, but the COVID-19 pandemic rendered the search futile.

Greenberg Traurig kept the Title Insurers informed about the developments as they occurred. One of Mirae's attorneys from Greenberg Traurig later testified that he knew a failure to disclose information about the Delaware and California litigation could risk the Buyer's coverage under a standard exclusion in title insurance policies for knowingly withholding information from an insurer. Gibson Dunn attorneys also communicated with the Title Insurers regularly in March and April 2020.

As the scheduled closing date (April 17, 2020) neared, Anbang and Gibson Dunn pushed to close on schedule while Mirae and Greenberg Traurig requested more time, given the unresolved problems. During this time, the parties' relationship became more adversarial. On April 2, 2020, Anbang informed Mirae of Strategic's actions in response to the COVID-19 pandemic, which included temporarily closing two hotels (one ahead of its normal seasonal closing), operating other hotels at

reduced staffing, and pausing all non-essential capital spending.[19] Anbang asked for Mirae's consent, while maintaining that it was not required, nor could it have been reasonably withheld due to the pandemic.[20] Mirae responded that "[w]e are not, at this point, prepared to [consent], at least without further and more detailed information, as all of this is vital to the business that we have contracted to purchase."[21] Mirae also requested specific information, including "[t]he dates on which any hotels, F&B and other amenities were closed at each hotel."[22] The record does not show any response from Anbang.

On April 7, 2020, the Title Insurers informed Gibson Dunn that it was difficult to assess the risk that the DRAA Agreement posed. None of the Title Insurers had seen the document, and the group felt unable to provide an assessment without it. As the Title Insurers said: "We just do not know how to properly underwrite the risk without a copy of the [DRAA Agreement], which we understand is not able to be provided us, apparently pursuant to its terms."[23] Despite Anbang's position that the document was a fraud, the Title Insurers were concerned about potential provisions in the DRAA Agreement that could encumber or restrict the Seller's ability to sell the hotels.

---

[19] App. to Opening Br. at A4757–58.
[20] *Id.* at A4759-60.
[21] *Id.*
[22] *Id.*
[23] *AB Stable*, 2020 WL 7024929, at *41.

16

On April 13, 2020, the Title Insurers issued title commitments for the hotels with an exception to coverage, the "DRAA Exception." The DRAA Exception excludes coverage for "[a]ny defect, lien, encumbrance, adverse claim, or other matter" stemming from or disclosed by the DRAA Agreement, the Delaware litigation, or the California Judgment.[24] The DRAA Exception was broad and excluded coverage for the fraudulent deeds.[25] On April 14, 2020, following the issuance of the title commitments, Anbang for the first time filed an emergency motion in the Court of Chancery to obtain a copy of the DRAA Agreement. The court granted the motion immediately.

On April 15, 2020, the Buyer gave formal notice that the Seller's representation that it and its subsidiaries possessed good and marketable title to all owned real property had not been satisfied. This, according to the Buyer, was a failure to satisfy a closing condition and the Seller's failure to cure would give the Buyer the right to terminate the Sale Agreement. On April 16, 2020, Anbang gave the DRAA Agreement to Mirae and the Title Insurers. For the first time, the Buyer and the Title Insurers had the complete DRAA Agreement.[26]

---

[24] App. to Opening Br. at A4866.
[25] *Id.* at A1467 (Trial Tr. at 1257); App. to Reply Br. at B114.
[26] The DRAA Agreement was sent in Chinese (as written), and Greenberg Traurig shortly thereafter obtained an English translation.

17

On April 17, 2020, the scheduled closing date, the Buyer gave formal notice of default based on the inaccurate representation of good and marketable title, the Seller's failure to operate Strategic and its subsidiaries in the ordinary course of business, and five other inaccurate representations. The Seller's failure to satisfy closing conditions, according to the Buyer, meant that the Buyer was not obligated to close. The notice went on to say that, if the Seller did not cure the breaches by May 2, 2020, the Buyer could terminate the Sale Agreement. The Seller sent the Buyer a certificate affirming that its representations were accurate, and all closing conditions were satisfied. The Seller continued to argue that the Buyer was required to close and that failure to do so would constitute a willful breach of the Sale Agreement.

On April 22, 2020, Gibson Dunn sent another copy of the DRAA Agreement to the Title Insurers, pointing out issues with the document indicative of fraud, and sent a similar letter to Greenberg Traurig. Greenberg Traurig continued to ask Anbang and Gibson Dunn for information about the DRAA Agreement. Among other things, Greenberg Traurig noted that the DRAA Agreement seemed to implicate properties covered by the Sale Agreement and asked why the underlying litigation (and years of history with Zhou) was not disclosed when the fraudulent deeds first arose. Greenberg Traurig followed up with another set of questions on April 24, 2020, explaining that the answers would help Mirae evaluate Anbang's

18

position that the DRAA Agreement was not authentic and assess any title claims. Anbang did not respond.

Anbang and the Seller's eventual response, on April 27, 2020, was to file this action in the Court of Chancery. The Seller sought specific performance compelling the Buyer to perform under the Sale Agreement. In addition, the Seller claimed that the Buyer could have locked in financing prior to signing the Sale Agreement, but the Buyer had delayed seeking financing because it believed that it could obtain preferential rates and terms by waiting—despite the fact the Seller knew that the Buyer had repeatedly sought financing before February 2020. On May 3, 2020, the Buyer gave notice of termination of the Sale Agreement on the grounds that the Seller had failed to cure its breaches. Soon after, the Buyer filed counterclaims claiming that the Seller had failed to satisfy closing conditions, had breached express and implied contractual obligations, and had committed fraud.

The Court of Chancery held an expedited trial in August 2020.[27] In a post-trial opinion, the Court of Chancery concluded that the Seller breached the "Ordinary Course Covenant" of the Sale Agreement by making "extraordinary changes to its business" that "departed radically from the normal and routine operation of the Hotels and were wholly inconsistent with past practice."[28] The Court of Chancery

---

[27] We commend the Court of Chancery for its work in this case, and all the cases the court has addressed during the COVID-19 pandemic.
[28] *AB Stable*, 2020 WL 7024929, at *75-76.

19

first rejected the Seller's argument that the term "business" was limited to Strategic's business as an asset management firm. Because the Ordinary Course Covenant included references to the business of the Company and its subsidiaries, the court found that "business" included the day-to-day business of operating the hotels. The court's reading was informed by other parts of the same covenant which required the Seller to maintain commercially reasonable levels of assets such as food, furniture, toiletries, and other items required in hotel operations.

The court then turned to what it meant to conduct business "only in the ordinary course of business, consistent with past practice in all material respects."[29] For this, the Court of Chancery compared the Seller's changes to hotel operations in response to the pandemic to its routine operations, *i.e.*, day-to-day practice before the pandemic. The court read the use of the adverb "only" in conjunction with the phrase "consistent with past practice" to mean that "the parties created a standard that looks exclusively to how the business has operated in the past."[30] Because the parties chose this standard, the court evaluated the Seller's operations before and after entering into the Sale Agreement without regard to "how other companies responded to the pandemic or operated under similar circumstances."[31] The court concluded that the Ordinary Course Covenant imposed an overarching and absolute

---

[29] *Id.* at *72 (quoting Sale Agreement § 5.1).
[30] *Id.* at *70-71.
[31] *Id.*

20

obligation, and that it did not incorporate an Material Adverse Event ("MAE") exception. It found the changes the Seller had made "significantly altered the operation of the business" and "were wholly inconsistent with past practice," thereby breaching the Ordinary Course Covenant and allowing the Buyer to terminate the Sale Agreement.[32]

## II.

The Seller claims that the Court of Chancery erred when it concluded that the Seller breached the Ordinary Course Covenant. As the Seller's argument goes, the Ordinary Course Covenant allowed the Seller to operate in response to unforeseen events occurring between signing and closing. Thus, according to the Seller, acting in the ordinary course of business includes proportional changes in response to extraordinary circumstances—like the responses of other hotel owners in response to the pandemic. The Seller also argues that the parties allocated the risk of a pandemic to the Buyer through the MAE covenant. To harmonize the two covenants, the Seller says, the court should have recognized that the Ordinary Course Covenant permitted reasonable, industry-standard responses to systemic risks

---

[32] *Id.* at *75-78. The termination provision of the Sale Agreement, referred to in the opinion as the "Temporal Termination Right," provided that if any condition to closing set forth in Article VII of the Sale Agreement was not satisfied by June 10, 2020, either party had the ability to terminate; if conditions that could only be satisfied at closing or the condition in § 7.3(c) were not satisfied at closing the termination date would be extended to September 10, 2020; and that these provisions held as long as the terminating party was not the "cause of the failure of the Closing to occur on or prior to such date[.]" *Id.* at *99 (citing Sale Agreement § 8.1(c)).

allocated to the Buyer by the MAE provision. Not doing so, in the Seller's view, negated the risk allocation in the Sale Agreement. Finally, the Seller contends that any breach of the Ordinary Course Covenant was immaterial because the Buyer's denial would have been unreasonable, given that it was taking the same drastic actions to respond to the pandemic at its own properties. Also, according to Seller, the delay in notice was immaterial, because the Seller notified the Buyer of the changes to its hotel operations just two weeks after changing its operations to adjust to the pandemic.

The Buyer counters that the changes made to the hotels were far from ordinary or routine. Instead, the changes were a drastic departure from the past practices of its hotel operations, thereby breaching the Ordinary Course Covenant. According to the Buyer, the Ordinary Course Covenant's plain language required the Seller to continue normal and routine operations—as measured by its past practice without regard to the pandemic—or to give notice to the Buyer so the Buyer could decide whether to consent. The Ordinary Course Covenant, according to the Buyer, does not have any efforts-based qualification (*e.g.*, "reasonable efforts" or "commercially reasonable efforts") nor a direction to compare the Seller's actions to those of others in the industry. As such, the Seller was required to act only in the ordinary course of business, as judged by its own historical practices and not in comparison to others in the hotel industry. The Buyer also contends that the Ordinary Course Covenant

22

and the MAE provision are separate contractual provisions, that serve different purposes, and the parties' other references to materiality in the contract indicate that they chose not to import the terms of one into the other.[33]

On appeal, "[w]e defer to the Court of Chancery's factual findings supported by the record, but review the Court of Chancery's contract interpretation *de novo*."[34]

## A.

Section 7.3(a) of the Sale Agreement (the "Covenant Compliance Condition") conditions the Buyer's obligation to close upon the Seller "hav[ing] performed in material respects all obligations and agreements and complied in all material respects with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing."[35] Thus, the question before the Court of Chancery was whether there was material noncompliance with a covenant or condition required by the Sale Agreement that allowed the Buyer to terminate the sale. The Ordinary Course Covenant—Section 5.1—provides that:

> Except as otherwise contemplated by this Agreement or as set forth in
> Section 5.1 of the Disclosure Schedules, between the date of this

---

[33] The Buyer also points out that an MAE provision addresses the valuation of a business, not the methods of business operation controlled by the Ordinary Course Covenant. Answering Br. at 32 (citing *AB Stable*, 2020 WL 7024929, at *74). The Buyer contends the notice requirement of the Ordinary Course Covenant supports this reading, as it ensures "that [the] Buyer has a say in any fundamental changes that [the] Seller wishes to make in response to such events." *Id.* at 34.

[34] *Heartland Payment Sys., LLC v. InTEAM Assocs., LLC*, 171 A.3d 544, 556-57 (Del. 2017). "When [those] factual findings are based on determinations regarding the credibility of witnesses, . . . the deference already required by the clearly erroneous standard of appellate review is enhanced." *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000).

[35] App. to Opening Br. at A2950 (Sale Agreement § 7.3(a)).

Agreement and the Closing Date, unless the Buyer shall otherwise provide its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), the business of the Company and its Subsidiaries shall be conducted only in the ordinary course of business consistent with past practice in all material respects, including using commercially reasonable efforts to maintain commercially reasonable levels of Supplies, F&B, Retail Inventory, Liquor Assets and FF&E consistent with past practice, and in accordance with the Company Management Agreements.[36]

As commonly understood, "ordinary" is defined as "[b]elonging to the regular or usual order or course of things; having a place in a fixed or regulated sequence; occurring the course of regular custom or practice; occurring in the course of regular custom or practice; normal; customary; usual."[37] Black's Law Dictionary defines "ordinary" as "[o]ccurring in the regular course of events; normal; usual."[38] When "ordinary" is used in conjunction with "course of business," Black's defines it as "[t]he normal routine in managing a trade or business. – Also termed *ordinary course of business*."[39] Delaware courts have interpreted "ordinary course" as "[t]he normal and ordinary routine of conducting business."[40]

---

[36] *Id.* at A2932-33 (Sale Agreement § 5.1). "F&B" refers to any subsidiary's interest in unexpired food and beverages located on company property, excluding liquor assets, and "FF&E" refers to any subsidiary's interest in assets such as furniture, fixtures, equipment, machinery, and other corporeal, movable company property. *See id.* at A2904 (Sale Purchase Agreement § 1.1).

[37] *Ordinary*, Oxford English Dictionary (2d ed. 1989), *available at* Oxford English Dictionary Online (last visited September 29, 2021).

[38] *Ordinary*, Black's Law Dictionary (11th ed. 2019).

[39] *Course of Business*, Black's Law Dictionary (11th ed. 2019); *see Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009) ("Black's Law Dictionary defines 'usual' as '1. Ordinary; customary. 2. Expected based on previous experience[.]'").

[40] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *17 (Del. Ch. Oct. 31, 2014) (alteration in original) (quoting *Ivize*, 2009 WL 1111179, at *9); *accord*

On appeal, the Seller tries to limit the Ordinary Course Covenant to the "moral hazard" problem—misconduct by a seller such that what a buyer purchases is not what it gets.[41] But ordinary course covenants are not so narrowly applied. While they do protect against a seller's misconduct between signing and closing, the covenant in general prevents sellers from taking any actions that materially change the nature or quality of the business that is being purchased, whether or not those changes were related to misconduct.[42]

As a factual matter, the Court of Chancery found that although the COVID-19 pandemic "warranted [the Seller's] changes" and the changes were "reasonable" from a financial and practical standpoint, the "extraordinary" changes nevertheless

*Snow Phipps Grp.*, *LLC v. KCAKE Acquisition*, *Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021); *Anschutz Corp. v. Brown Robin Capital*, *LLC*, 2020 WL 3096744, at *11 (Del. Ch. June 11, 2020); *Project Boat Hldgs. LLC v. Bass Pro Grp.*, *LLC*, 2019 WL 2295684, at *20 & n.196 (Del. Ch. May 29, 2019).

[41] *See ChyronHego Corp. v. Wight*, 2018 WL 3642132 (Del. Ch. July 31, 2018) (financial manipulation); *Ivize of MilwaukeeLLC v. Compex Litig. Support, LLC*, 2009 WL 1111179 (Del. Ch. Apr. 27, 2009) (looting).

[42] *See Anschutz*, 2020 WL 3096744, at *11 ("These representations are common in transaction agreements and are included to reassure a buyer that the target company has not materially changed its business or business practices during the pendency of the transaction."); *Akorn*, *Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *83 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) ("Parties include ordinary-course covenants in transaction agreements to add an additional level of protection for the buyer beyond the Bring-Down Condition and help ensure that 'the business [the buyer] is paying for at closing is essentially the same as the one it decided to buy at signing . . . .'" (alteration in original) (citation omitted)); ABA Mergers & Acqs. Comm., *Model Merger Agreement for the Acquisition of a Public Company* 177 (2011) ("The buyer has a strong interest in assuring that, at closing, the target's business will be substantially the same as it was on the date the merger agreement was signed. To do so, the buyer typically attempts to negotiate covenants to maintain the status quo.").

materially deviated from routine business operations.[43]  Among the "[o]verwhelming evidence"[44] at trial, the court found:

- "Strategic closed two of the Hotels entirely and limited operations at the other thirteen severely."[45]  By closing one of the hotels, Strategic extended its normal seasonal closure by two months.  The other hotel's closure was unprecedented.[46]

- The other thirteen hotels operated as "closed but open"[47] and ceased all food and beverage operations except room service, which was also limited.  They also "shut down or limited all other amenities, including gyms, pools, spa and health club operations, recreational activities, club lounge operations, valet parking, retail shops, and concierge and bellhop services."[48]

- Strategic laid-off or furloughed over 5,200 full-time-equivalent employees.  Remaining employees' work weeks were truncated, and the employees were encouraged to take vacation or paid time off.  Any employee raises were deferred until further notice.

- Many Strategic hotels operated with minimal staffing, and engineering coverage was limited to safety and OSHA issues.  "[T]he Hotels' front desks assumed responsibility from call centers for all calls."[49]

- Strategic also minimized spending on marketing and capital expenditures.[50]  The Seller's expert on the hospitality industry testified that Strategic's marketing expenses decreased year-over-year by 33.1%, 76.4%, and 69% in March, April, and May 2020.[51]

---

[43] *AB Stable*, 2020 WL 7024929, at *75.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at *76.
[50] *Id.*
[51] *Id.*

- Strategic's "changes departed radically from the normal and routine operation of the Hotels and were wholly inconsistent with past practice."[52] Strategic's top executive admitted that by April 23, 2020, Strategic's changes to its business operations were "major" and "material" compared to past practice.[53] Both the Buyer's and the Seller's hospitality industry experts opined that the changes made in response to the pandemic were unprecedented.[54]

On appeal, the Seller claims it was justified in taking reasonable, industry-consistent steps to preserve the business in response to the COVID-19 pandemic. There are two problems with this argument. First, the parties did not choose the actions of industry participants as the yardstick to measure the Seller's actions, in a pandemic or outside of one. The covenant in this case required the Seller to operate "only in the ordinary course of business, consistent with past practice in all material respects." As the Court of Chancery correctly found, the requirement that the Seller operate *only* in the ordinary course and consistent with past practice in *all material respects* means that its compliance is measured by its operational history, and not that of the industry in which it operates.[55] And second, the covenant is absolute—it

---

[52] *Id.*

[53] *Id.*

[54] In a footnote, Anbang argues that some of these changes took place after it sought consent, and therefore the trial court erred in including those changes in the materiality analysis. Opening Br. at 42 n.9. But Mirae had already refused to consent when asked and Anbang continued to make changes, knowing it did not have consent to make the changes.

[55] *See Snow Phipps*, 2021 WL 1714202, at *38 ("Where an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase, however, the court evaluates [how the specific seller has operated]."); *see also* Guhan Subramanian & Caley Petrucci, *Deals in the Time of Pandemic*, 121 Colum. L. Rev. 1405, 1419-20 (2021) ("In the absence of the 'consistent with past practice' language, a court may apply an objective standard of ordinary course, looking to the operations of other similar companies in the industry *during* the preclosing period, rather than a subjective standard of the seller's practices *prior to* the preclosing period." (footnote omitted)); *id.*

does not have a reasonableness qualifier.[56] The parties included commercially reasonable efforts qualifiers elsewhere in the contract, even in the same sentence—making the absence in the relevant part of the covenant all the more conspicuous.[57] Looking to the actions of other hotels in the industry to judge pandemic response is more analogous to a commercially reasonable efforts provision.[58] The plain

at 1419 ("A requirement to run the business consistent with past practice is generally more stringent, giving the seller less flexibility than a covenant that does not include this requirement."); *see also* ABA Mergers & Acqs. Comm., *Model Merger Agreement for the Acquisition of a Public Company* 180 (2011) (explaining that a "target might object to the limitation 'consistent with past practices,' particularly when its business has been changing in recent periods or where its business or its industry is troubled or is growing rapidly."). Anbang contends the Court of Chancery's reading reads "ordinary course of business" out of the provision, creating impermissible surplusage. Reply. Br. at 12-13 (citing *AB Stable*, 2020 WL 7024929, at *161). But the Court of Chancery extensively discussed how certain actions could fall outside the "ordinary course of business" even if they were "consistent with past practice," in cases of fraud and misrepresentation. *AB Stable*, 2020 WL 7024929, at *154-55 n.242. The plain language of "consistent with past practice" is that it further modifies "ordinary course of business"—both "only" and "consistent with past practice" give meaning to the "ordinary course of business." *Id.* at *161.

[56] *Cooper Tire*, 2014 WL 5654305, at *15 (finding that the obligation to "conduct [the company's] business in the ordinary course of business consistent with past practice" "imposes an unconditional obligation"); *see also* Subramanian & Petrucci, note 55, at 1420; Kling, Nugent & Dyke, *Negotiated Acquisitions of Companies*, *Subsidiaries & Divisions*, § 13.03 n.6 (2021) ("Second, serious consideration should be given either to arguing for an *efforts* standard in the ordinary course covenant or specific exceptions to the covenant for post-signing extraordinary events which might render compliance impossible for the seller.").

[57] App. to Opening Br. at A2933 (Sale Agreement § 5.1) (requiring use of "commercially reasonable efforts to maintain commercially reasonable levels of Supplies, F&B, Retail Inventory, Liquor Assets and FF&E consistent with past practice, and in accordance with the Company Management Documents"); *id.* ("The Seller shall cause the Company and its Subsidiaries to use their respective commercially reasonable efforts to preserve intact in all material respects their business organization and to preserve in all material respects the present commercial relationships with key Persons with whom they do business.").

[58] In *Akorn*, this Court looked to "a generic pharmaceutical company" to determine what Akorn was required to do under an ordinary course covenant which required "commercially reasonable efforts." *Akorn*, 2018 WL 4719347, at *84, *88. Anbang asks us to do the same thing with respect to "[l]uxury hotels around the country"—without the benefit of a commercially reasonable efforts qualifier. Opening Br. at 33.

language of the Sale Agreement, however, does not include a reasonable efforts provision for the ordinary course requirement.[59]

The Seller relies heavily on the Court of Chancery's decision in *FleetBoston Financial Corp. v. Advanta Corp.*[60] In *FleetBoston*, the buyer of the assets of a consumer credit card company alleged that the seller breached a contribution agreement. The covenants required the seller to operate in the ordinary and usual course of business between signing and closing. In relevant part, the seller conducted credit card solicitation campaigns consistent with past practice and in "substantial accordance" with previously disclosed marketing plans.[61] The buyer argued that the seller had engaged in an unprecedented campaign offering current customers low-interest rates and lowering its credit standards.[62] While the seller had previously engaged in competitive marketing campaigns, it was alleged that the volume of low-interest rate accounts, unprofitability of the accounts, and offers to existing customers "deviated [] dramatically" from the seller's prior practices.[63]

---

[59] *See Urdan*, 244 A.3d at 675 ("[W]e must still interpret the contract[] as written and not as hoped for by litigation-driven arguments."); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *6 (Del. Ch. June 21, 2012) ("Under Delaware law, courts will not rewrite contracts to read in terms that a sophisticated party could have, but did not, obtain at the bargaining table."). The Seller suggests that it was obligated to use commercially reasonable efforts to preserve the Seller's business and this excuses its deviation from the ordinary course of business. Opening Br. at 33-34. This argument, however, was waived below. As the Court of Chancery held, the Seller devoted little attention to it in post-trial briefing, did not develop it, and failed to provide authorities for support the argument. *See AB Stable*, 2020 WL 7024929, at *78 & n.273.

[60] 2003 WL 240885 (Del. Ch. Jan. 22, 2003).

[61] *Id.* at *25.

[62] *Id.* at *25-26.

[63] *Id.* at *26.

The Court of Chancery rejected the buyer's arguments because the record showed "the volume of relationship management accounts and the APRs applicable to those accounts were consistent with [the company]'s past practices and then current marketing plans."[64]  According to the court, the seller "had always competitively priced introductory offers to its existing customers" and "competition for customers among the credit card companies had become increasingly fierce, manifesting itself in the form of lower APRs . . . ."[65]  And when the seller was "[f]aced with the threat of an exodus of existing balances, [the company] had only one alternative: match its competitors' strategy by offering attractive APRs to its existing customers . . . ."[66]  The court concluded that the parties' agreement did not reflect an intent for the company "to be contractually precluded from making relationship management offers that would be competitive in the marketplace."[67]

The Seller claims that *FleetBoston* means an ordinary course covenant does not "'preclude[]' the seller from taking action necessary to 'be competitive in the marketplace.'"[68] As a general statement, that is correct.  But the court in *FleetBoston* decided, based on the factual record, that the marketing campaign was part of the ordinary course of business, the campaign had been disclosed to the buyer before the

---

[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] Opening Br. at 32 (quoting *FleetBoston*, 2002 WL 240885, at *26).

parties entered into a sale agreement, "and the APRs applicable to those accounts were consistent with [the seller's] past practices and then current marketing plans."[69] Under *FleetBoston*, it is the facts—and the specific language of the contract's ordinary course covenant—that determine whether a seller has acted in the ordinary course of business.

The closest the court came to finding that the seller's actions were outside the ordinary course of business—what gave the court "the most pause"—was the allegation that the relationship management offers were inherently unprofitable and had lowered the company's credit standards, attracting less creditworthy customers and potentially affecting the long-term profitability of the asset.[70] In other words, if the seller were to adopt procedures, even those acknowledged to be competitive in the industry, that significantly and materially deviated from prior practice, it could be a breach of an ordinary course provision.

The Court of Chancery further observed that the buyer's argument regarding long-term profitability was "far broader than the meager evidence cited to support it[:]" one sentence in a brochure.[71] The record was therefore "too thin to support a factual finding that [the company] lowered its credit standards as dramatically and

---

[69] *FleetBoston*, 2002 WL 240885, at *26.
[70] *Id.* at *27 (emphasis added).
[71] *Id.*

pervasively" as the buyer suggested.[72]  In other words, the court was unable to determine whether credit standards were lowered to a level that would breach the ordinary course covenant.[73]  Here, by contrast, the Court of Chancery found "[o]verwhelming evidence" supported by a comprehensive factual record that the Seller made changes that "were wholly inconsistent with past practice."[74]  We defer to that fully-supported factual finding.

The Court of Chancery's interpretation of the Ordinary Course Covenant is consistent with its earlier decision in *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*[75]  In *Cooper Tire*, the buyer terminated a merger agreement based on the failure of the seller and its subsidiary to act in the ordinary course of business between signing and closing.  Specifically, a minority partner in a Cooper Tire subsidiary opposed the merger and shut down operations at the subsidiary.  Cooper Tire reacted by suspending payments to the subsidiary's

---

[72] *Id.*

[73] Also relevant is the recent Court of Chancery decision of *Snow Phipps*, 2021 WL 1714202.  In *Snow Phipps*, the buyer, Snow Phipps, alleged that the seller KCAKE had violated the ordinary course covenant by drawing down on its revolver more than it had done previously and implementing cost-cutting measures.  *Id.* at *38.  But in that case, the seller had drawn on the revolver five times in the past three years, offered to cure (under a provision of the contract that required notice of breach and opportunity to cure), and never used the funds.  *Id.* at *39.  The court also decided that on the record before it, not only did "[s]pending var[y] only in expected and *de minimis* ways from prior years with higher sales[, but that the buyer] bore the burden of proof but neglected to meaningfully engage in these points," causing its argument to fail.  *Id.* at *40.  The court compared KCAKE's actions with its prior business operations and determined that its pandemic responses were consistent with past practice and fell within the contractual requirement to operate "in a manner consistent with the past custom and practice."  *Id.* at *37, *40.

[74] *AB Stable*, 2020 WL 7024929, at *76.

[75] 2014 WL 5654305 (Del. Ch. Oct. 31, 2014).

suppliers to pressure the subsidiary to resume operations. Given the unprecedented nature of the work stoppage and Cooper Tire's apparent desire to disrupt the course of business, the court found that the seller's actions were not in the normal and ordinary routine of conducting business. According to the court, it was irrelevant that the seller might have acted reasonably in response to an extraordinary event. The seller still breached the ordinary course covenant.

As in *Cooper Tire*, the Seller here agreed to a covenant that required it to operate its hotels in the ordinary course of business consistent with past practice. While the Seller might have been within its rights to respond to the regular ups and downs of the hotel business, the Court of Chancery found as a factual matter that the Seller took drastic actions that were not consistent with its own past responses. Its actions might have been reasonable in response to a world-wide pandemic, but they were inconsistent with past practice and far from ordinary. The Seller could have timely sought the Buyer's approval before making drastic changes to its hotel operations, approval which could not be unreasonably withheld. Having failed to do so, the Seller breached the Ordinary Course Covenant and excused the Buyer from closing.

B.

The Seller argues next that the Court of Chancery's reading of the Ordinary Course Covenant cannot be squared with the Sale Agreement's MAE provision.

33

Because the MAE provision allocated pandemic risk to the Buyer, the Seller contends that business changes in response to the pandemic do not violate the Ordinary Course Covenant because such a violation would improperly shift systemic risks onto the Seller.[76] As the Seller argues, to give effect to both the MAE provision and the Ordinary Course Covenant, the Ordinary Course Covenant must give the Seller the freedom to take "reasonable, industry-standard responses to systemic risks allocated to [the Buyer] by the MAE provision."[77] In other words, reasonable responses to an event carved out from the MAE provision do not violate the ordinary course covenant.

We agree, however, with the Court of Chancery's analysis of the two provisions. As an initial matter, the parties could have, but did not, restrict a breach of the Ordinary Course Covenant to events that would qualify as an MAE. They knew how to provide for such a limitation—there are MAE qualifiers included in other provisions.[78] For example, the No-MAE Representation in § 3.8 of the Sale Agreement requires the Seller to attest to whether an MAE has occurred "*whether or not* in the ordinary course of business."[79] As the Court of Chancery found, "[t]he

---

[76] On appeal, neither party argues that the Court of Chancery erred in finding that the COVID-19 pandemic fit within the Sale Agreement's MAE carve-out for "natural disasters and calamities." *AB Stable*, 2020 WL 7024929, at *59.

[77] Opening Br. at 37.

[78] *See* App. to Opening Br. at A2917 (Sale Agreement § 3.1(a)); *id.* at A2920 (Sale Agreement § 3.8); *id.* (Sale Agreement § 3.9(a)).

[79] *Id.* at A2920 (Sale Agreement § 3.8) (representing and warranting that "[s]ince the date of the Balance Sheet, . . . there have not been any changes, events, state of facts or developments,

34

No-MAE Representation thus distinguishes between the question of whether the business operated in the ordinary course and whether the business suffered a Material Adverse Effect, and it makes the former irrelevant to the latter."[80]

The parties also chose different materiality standards for the two provisions, which shows that the parties intended the provisions to act independently. The Ordinary Course Covenant's materiality standard requires that "the business of the Company and its Subsidiaries shall be conducted only in the ordinary course of business consistent with past practice in all material respects[.]"[81] As a contractual provision, the phrase "[i]n all material respects . . . seeks to exclude small, *de minimis*, and nitpicky issues that should not derail an acquisition."[82] The Material Adverse Effect provision self-referentially defines an MAE as a "material adverse effect."[83] The MAE standard is much higher and "analytically distinct" from

---

*whether or not in the ordinary course of business* that, individually, or in aggregate, have had or would reasonably be expected to have a Material Adverse Effect" (emphasis added)).

[80] *AB Stable*, 2020 WL 7024929, at *74. The court in *Cooper Tire* did not note similar references elsewhere in the contract—but also agreed that the contract should be read as a whole. *See generally* 2014 WL 5654305; *id.* at *19 & n.118 (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010)).

[81] *Id.* at A2932-33 (Sale Agreement § 5.1).

[82] *Akorn*, 2018 WL 4719347, at *85.

[83] *AB Stable*, 2020 WL 7024929, at *54-55 (The Court of Chancery "assume[d] for purposes of analysis that Strategic suffered an effect due to the COVID-19 pandemic that was sufficiently material and adverse" but that fell within an MAE carve-out and so did not address the construction of "material" within the MAE provision).

35

materiality in the Ordinary Course Covenant, "even though their application may be influenced by the same factors."[84]

Further, an ordinary course covenant and MAE provision serve different purposes. An ordinary course covenant is "'included to reassure the Buyer that the target company has not materially changed its business or business practices during the pendency of the transaction.'"[85] A MAE provision, by contrast, allocates the risk of changes in the target company's valuation.[86] Buyers want to know both that the business is operated in the same way and that the business is worth about the same amount. How a business operates between signing and closing is a fundamental concern distinct from the company's valuation.[87] And while the MAE provision

[84] *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *38 (Del. Ch. Apr. 29, 2005); *accord Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *17 (Del. Ch. Dec. 18, 2019); *Akorn*, 2018 WL 4719347, at *85-86.

[85] *Id.* at *68 (quoting *Anschutz*, 2020 WL 3096744, at *11).

[86] *See Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) ("The important consideration [to determine whether an MAE has occurred] is whether there has been an adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period . . . ."); *Snow Phipps Grp., Inc.*, 2021 WL 1714202, at *2 (finding "the plaintiffs proved that DecoPac did not breach the MAE representation, given the durational insignificance and corresponding immateriality of the decline in sales."); *see also* Robert T. Miller, *Material Adverse Effect Clauses and the COVID-19 Pandemic* 12-13 (Univ. Iowa Coll. L. Legal Stud. Rsch. Paper, No. 2020-21, 2020) ("A material adverse effect . . . is really a change in the *reasonable valuation of the company*."); Robert T. Miller, *Pandemic Risk and the Interpretation of Exceptions in MAE Clauses*, 46 J. Corp. L. 681, 690-91 (2021) ("[E]veryone agrees that a material adverse effect requires a significant . . . diminution in the standalone value of the target. . . . As a question of valuation, however, it concerns the *magnitude* of the adverse effect, not its *cause*; whether the adverse effect arises from a pandemic, problems internal to the operations of the company, or any other cause is thus irrelevant to the inquiry.").

[87] Kling, Nugent & Dyke, *Negotiated Acquisitions of Companies, Subsidiaries & Divisions*, § 13.03 (2021) (Discussing ordinary course provisions and observing "[t]he parties' motivations are clear: the Buyer wants to make sure the business it is paying for at closing is essentially the

shifts systemic risks like the pandemic and its effect on valuation to the Buyer, the Ordinary Course Covenant, consistent with its purpose, ensured that the Seller could not materially alter its course of business without the Buyer's notice and consent. It was possible for the Seller to operate "in the ordinary course" throughout the pandemic.[88]

To this point, the Buyer claims that it was not required to run the business into the ground by continuing to operate in the ordinary course of business. The Sale Agreement, however, anticipated this dilemma. The Ordinary Course Covenant involves the Buyer in the Seller's response to disruptive events. The Buyer might have wanted to respond to the pandemic in different ways, to ensure the long-term profitability of the business or to prioritize one area over another. The Seller was not hamstrung by the Ordinary Course Covenant—it was simply required to seek consent before making the changes, and if consent was "unreasonably" denied, the Seller could have challenged the Buyer's unreasonable denial of consent.

The Seller also argues that the Court of Chancery's reliance on *Cooper Tire* is misplaced, because in that case, "the event at issue was not, in fact, carved out of the MAE definition[,]" as compared to the "natural disasters or calamities" carve-

---

same as the one it decided to buy at signing . . . and the Seller wants to operate as free of constraints as possible.").

[88] *E.g.*, *Snow Phipps Grp., LLC*, 2021 WL 1714202, at *40 (finding that the seller operated in the ordinary course of business throughout the COVID-19 pandemic).

out in the Sale Agreement MAE.[89]  That is correct, but as we have already explained, the plain language of the Ordinary Course Covenant controls: here, the Seller was required to operate the hotels "consistent with past practice," but instead it "departed radically" from that practice.[90]  Additionally, the different materiality standards in the two provisions, the absence of a reference to the MAE provision in the Ordinary Course Covenant, and the different purposes served by the two provisions lead to the conclusion that the parties intended the two provisions to act independently.

## C.

Finally, while the Seller does not contest the materiality of the changes it made in response to the pandemic, it argues that any breach of the Ordinary Course Covenant was immaterial because there was only a two-week delay before Anbang requested Mirae's consent and Mirae "unreasonabl[y]" withheld its consent.[91]  Anbang did seek Mirae's consent—while simultaneously insisting that it did not

---

[89] Opening Br. at 37-38 (citing *Cooper Tire*, 2014 WL 5654305, at *19).  The *Cooper Tire* MAE had two parts. Subsection (i) defined "material adverse effect" broadly and then listed a number of exceptions. *Cooper Tire*, 2014 WL 5654305, at *18.  But subsection (ii) also provided that any event—even an event specifically carved out of the Material Adverse Effect provision—could serve as an MAE if it "would reasonably be expected to prevent or materially delay or impair the ability of [Cooper] to perform its obligations under this agreement or to consummate the transactions." *Id.* at *19.  The Sale Agreement in this appeal does not contain this provision.  In other words, the parties in *Cooper Tire* linked the MAE to the seller's closing obligations, while Anbang and Mirae kept the MAE distinct from the Ordinary Course Covenant. This drafting choice does not change the fact that Anbang violated the plain terms of the covenant by "depart[ing] radically" from its past practice.  *AB Stable*, 2020 WL 7024929, at *75-76.
[90] *AB Stable*, 2020 WL 7024929, at *75-76.
[91] Opening Br. at 40-42.

38

believe consent was required—by a two-page email on April 2, 2020.[92]  But when Mirae replied with a request for additional information about the hotels it was about to acquire, Anbang did not respond.[93]  It was not unreasonable for Mirae to withhold consent when Anbang refused Mirae's reasonable request for details.

As the Court of Chancery noted, "[c]ompliance with a notice requirement is not an empty formality."[94]  The undisputed fact remains that Anbang never obtained consent before making drastic changes to Strategic's business operations and did not cure when given the opportunity by Mirae.[95]  The Seller was not required to run its hotels into the ground to comply with the Sale Agreement, but the Seller had a contractual obligation to secure the Buyer's consent—not to be unreasonably withheld—before making drastic changes to its hotel operations.  Having failed to do so, it breached the Sale Agreement, which excused the Buyer's obligation to close.

---

[92] App to Opening Br. at 4760–61.

[93] *Id.* at 4759.  Mirae wrote that "[w]e are not, at this point, prepared to concede that you had the right to take such actions unilaterally, nor that we would have been required to consent to the actions that you have taken, **at least without further and more detailed information, as all of this is vital to the business that we have contracted to purchase.**" *Id.* (emphasis added).  Mirae then requested specific information, including "[t]he dates on which any hotels, F&B and other amenities were closed at each hotel." *Id.*

[94] *See Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, No. CV 2018-0927-SG, 2019 WL 1223026, at *15-16 (Del. Ch. Mar. 14, 2019) (requiring actual notice of intent to extend closing date even when the party had clearly acted in a way indicating it intended to extend).

[95] *AB Stable*, 2020 WL 7024929, at *98.

## III.

The judgment of the Court of Chancery is affirmed.